NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 250638-U

NO. 4-25-0638

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 13, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* ESTATE OF FREDERICK STEGALL, | ) | Appeal from the |
| Deceased, | ) | Circuit Court of |
| | ) | Knox County |
| (F&M Bank, Galesburg Rifle Club, an Illinois Not-for-Profit, and The Catholic Diocese of Peoria, an Illinois Religious Corporation, | ) | No. 21MR21 |
| | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| v. | ) | |
| Tonny J. Williamson and Penny J. Williamson, | ) | Honorable |
| | ) | Curtis S. Lane, |
| Defendants-Appellants). | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Doherty and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed the trial court's entry of judgment against defendants, holding:
        (1) the court had personal and subject-matter jurisdiction;
        (2) defendants forfeited multiple issues;
        (3) plaintiffs were properly allowed to file a third amended complaint;
        (4) the court properly denied defendants' motion for judgment notwithstanding the verdict;
        (5) the jury's punitive damage award was proper and not excessive;
        (6) the court did not err in instructing the jury;
        (7) the court properly denied motions to substitute judge, and the record does not establish bias against defendants;
        (8) the court properly excluded evidence of a settlement offer;
        (9) the court properly denied defendants' motion for a mistrial; and
        (10) the court did not abuse its discretion in admitting Frederick Stegall's July 6, 2020, will into evidence.

¶ 2     In 2019, decedent, Frederick Stegall, had a will devising his property to plaintiffs,

the Galesburg Rifle Club (Rifle Club) and the Catholic Diocese of Peoria (Diocese). In June and early July 2020, defendants, Tonny J. Williamson and Penny J. Williamson, took Stegall to visit multiple attorneys. During that time, Stegall executed a healthcare power of attorney in favor of Penny, a power of attorney for property in favor of Tonny, an irrevocable trust over Stegall's real property naming defendants as trustees and beneficiaries, and a pour-over will devising any remaining property to the trust (collectively, the trust documents). A deed placing Stegall's real estate in the trust was also prepared but was not recorded at that time.

¶ 3       On July 6, 2020, friends and family members of Stegall, who were unaware of the trust documents and deed, but who believed Stegall might have been influenced to sign documents that did not reflect his intent, took Stegall to an attorney, James Blake, and a new power of attorney was signed in favor of Stegall's friend and neighbor, John Hessler. A new will was also executed, which was similar to the 2019 will, devising Stegall's property to the Rifle Club and the Diocese.

¶ 4       In January 2021, defendants had the deed recorded, and Tonny filed a petition seeking guardianship over Stegall, which was docketed as Knox County case No. 21-PP-10 (the guardianship action). What followed was a lengthy series of litigation. After the guardian *ad litem* (GAL) in the guardianship action determined Stegall did not intend to give property to defendants, plaintiffs filed a declaratory judgment action, seeking to invalidate the trust documents. That case was docketed as Knox County case No. 21-MR-21 (the declaratory judgment action). At the time the case was filed, Blake represented Stegall, Stegall had not been declared disabled or incompetent, and Stegall had not been appointed a guardian other than the GAL.

¶ 5       While the declaratory judgment action was pending, Stegall died. In Knox County

case No. 22-PR-12 (the probate action), defendants filed the July 2, 2020, pour-over will devising the property to the trust and a petition for probate. Plaintiffs filed a counterpetition and sought admission of the July 6, 2020, will.

¶ 6　　　　The cases were initially consolidated, but the trial court later severed them. Ultimately, a jury found in favor of plaintiffs in the declaratory judgment action and awarded them punitive damages. The court denied defendants' motion for judgment notwithstanding the verdict. In the probate action, the July 6, 2020, will was admitted to probate by agreement, and defendants later sought a proof-of-will hearing. That order was denied. Defendants appealed in each case, which was consolidated for appeal. On appeal, we affirmed the probate action but dismissed the declaratory judgment action based on the lack of a final order due to an outstanding motion for prejudgment interest. *In re Estate of Stegall*, 2024 IL App (4th) 230159-U, ¶¶ 23, 42.

¶ 7　　　　On remand, Penny and Tonny each filed a petition to vacate the void judgment under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2024)), alleging, in part, the orders in the declaratory judgment action were void because (1) the action was filed without authorization from Stegall's GAL, (2) Stegall's estate was never properly substituted as a party after his death, and (3) the plaintiffs lacked standing.

¶ 8　　　　Before the section 2-1401 petitions were ruled on, defendants filed a fourth motion to substitute the trial court judge, Curtis S. Lane, for cause. A different judge held a hearing, considered documentary evidence, and heard arguments but stated there was no need for an evidentiary hearing in which witnesses would testify. The court denied the petition. Judge Lane then heard and denied the section 2-1401 petitions and resolved all outstanding motions in the case with a statement that no new motions would be allowed.

¶ 9        On appeal, defendants contend (1) the trial court lacked personal and subject-matter jurisdiction, (2) the court erred regarding multiple evidentiary and other rulings, (3) plaintiffs were improperly allowed to amend their pleadings after evidence was presented, (4) the court erred in denying their motion for judgment notwithstanding the verdict, (5) the punitive damage award was improper and excessive, (6) the court gave various improper jury instructions, (7) the court was biased against defendants, and a substitution of judge for cause should have been granted, (8) the court wrongly excluded evidence of a settlement offer to the Rifle Club, (9) the court erred in denying defendants' motion for a mistrial, and (10) the court erred in admitting the July 6, 2020, will into evidence. We affirm.

¶ 10                          I. BACKGROUND

¶ 11        Stegall's 2019 will devised his property to the Rifle Club and the Diocese. In June and July 2020, Stegall executed powers of attorney and trust documents that instead benefited defendants. On July 6, 2020, Stegall revoked the powers of attorney in favor of defendants and executed a new power of attorney in favor of Hessler. He also executed a new will, naming Hessler as executor. That will devised Stegall's property to the Rifle Club and the Diocese. Defendants later recorded the deed funding the trust.

¶ 12                      A. Early Proceedings

¶ 13        On January 19, 2021, Tonny filed a petition seeking appointment of a guardian for Stegall, alleging Stegall had limited ability to manage his estate and financial affairs and nominating herself as guardian over Stegall's estate and person. On January 21, 2021, the trial court appointed Patrick Egan as GAL for Stegall to answer the petition and represent Stegall in the guardianship action.

¶ 14        On February 11, 2021, plaintiffs filed a complaint for a declaratory judgment in

the miscellaneous remedies division of the trial court, seeking recission of the trust documents Stegall executed in June and July 2020. Blake represented Stegall in the filing of the complaint. The complaint alleged the trust documents were obtained by undue influence and were presumptively fraudulent because defendants had a fiduciary relationship with Stegall. Plaintiffs later filed a second amended complaint, adding facts obtained from discovery and seeking recission based on (1) undue influence, (2) the temporary incapacity of Stegall, (3) presumptive fraud, (4) fraudulent misrepresentation as to the effect of the irrevocable trust, and (5) mutual mistake of fact regarding the designation of the trust as irrevocable.

¶ 15    On February 25, 2021, Egan submitted a report, stating he had interviewed Stegall on February 3, 2021. In the report, Egan stated his opinion the irrevocable trust was not a product of Stegall's wishes and should be set aside. Egan noted the declaratory judgment had been filed and identified Blake as Stegall's attorney. Egan stated Stegall was caught in a "tug of war" between people who wanted to protect him and people who would benefit by his death. To protect Stegall from being unduly swayed by others, Egan recommended F&M Bank be appointed temporary guardian of Stegall's estate. Egan recommended that Hessler be appointed temporary guardian of Stegall's person.

¶ 16    Also on February 25, 2021, Blake appeared at the status hearing involving issues in the guardianship action. It was noted a motion to consolidate the guardianship action with the declaratory judgment action had been filed and was unopposed. Blake informed the trial court of his representation of Stegall in matters involving Stegall's will and stated he planned to enter an entry of appearance in the guardianship action. The court indicated he did not need to do so if the actions were consolidated. The court then questioned its authority to assign a temporary guardian at that time absent evidence from a physician, further information from Egan, and representation

by counsel for Stegall in the guardianship action.

¶ 17 In March 2021, the declaratory judgment action was consolidated with the guardianship action by agreement of the parties. In April 2021, Egan requested the trial court to provide instruction concerning his role when the order appointing him ordered him to represent Stegall in the guardianship action. Egan expressed concern it was improper for him to act as Stegall's attorney and noted Stegall was represented by Blake.

¶ 18 On June 17, 2021, the trial court noted Stegall had personal counsel through Blake and directed Egan to monitor the litigation but not act as Stegall's attorney because Stegall had private counsel. That same day, F&M Bank was appointed temporary guardian of Stegall's estate by agreement of the parties.

¶ 19 On June 29, 2021, the trial court disqualified Blake as trial counsel because he was a potential witness in the case. The court allowed Blake to continue to advise Stegall and confer with new trial counsel. Egan subsequently petitioned for appointment of a temporary guardian over Stegall's person. Egan noted Stegall did not currently have counsel, and Egan believed a temporary guardian was necessary to prevent Stegall from being exploited during the litigation.

¶ 20 On July 11, 2021, the trial court severed the guardianship and declaratory judgment actions by agreement of the parties. Shortly after, Paul Mangieri entered his appearance as trial counsel for Stegall. Curtis Ford was later appointed temporary guardian of Stegall's person.

¶ 21 B. Early Discovery Proceedings

¶ 22 At the discovery stage of proceedings, one of plaintiffs' s counsels stated he would like to conform the complaint as nearly as possible to the facts as they developed. Before

trial, Stegall's deposition was set for April 7, 2021, with the agreement of defendants' then counsel, Andrew Cassidy. On March 26, 2021, Cassidy moved to withdraw as counsel, stating he initially entered his appearance as a convenience to defendants, with no intent to undertake representation of the matter to its conclusion. He further alleged irreconcilable differences between himself and defendants precluded effective representation.

¶ 23 On April 7, 2021, the trial court allowed Cassidy to withdraw. Cassidy told the court he originally filed the motion to withdraw in one case, but defendants had terminated his representation in the other case that morning. Defendants stated they had just been told Stegall's deposition was that day and asked for a continuance in order to obtain counsel. Counsel for plaintiffs expressed concern it was necessary to promptly obtain Stegall's deposition because of his age. The court stated the deposition would go ahead as planned but noted if defendants obtained new counsel who wanted to depose Stegall again, that would likely be allowed.

¶ 24 Cassidy was later a witness at trial, and a memo he wrote memorializing the April 7, 2021, proceedings was entered into evidence. In that memo, Cassidy wrote he suggested to defendants it was best if he remain as counsel at least through Stegall's deposition. Cassidy wrote Penny firmly stated there would be no deposition of Stegall that afternoon. Cassidy told her there was a trial court order in place for the deposition, but Penny was adamant there would be no deposition, and Cassidy decided to no longer debate the issue. The deposition proceeded on April 7, 2021, and defendants did not attend.

¶ 25 After Cassidy withdrew, attorney Christopher Ryan entered an appearance for defendants. Ryan was allowed to withdraw on August 11, 2021. Attorney Trygve Meade next appeared on behalf of defendants. Defendants' depositions were set for November 4, 2021, but they did not appear. Meade sent a text message to Stegall's counsel, Mangieri, advising he had

an emergency situation with his father and asked to continue the depositions. Mangieri told him that would be fine.

¶ 26 Plaintiffs later filed a motion to compel, seeking court-ordered depositions, noting the dates for depositions offered by defendants' attorney had been withdrawn. At a December 3, 2021, hearing, the parties told the trial court defendants agreed to be deposed on December 9, 2021. The record shows both defendants were present at the hearing. Also at the hearing, the court denied a motion by defendants to dismiss. Shortly after, defendants filed a motion for an interlocutory appeal, which was later denied. Meanwhile, defendants did not appear for their depositions, despite their attorney being present. As a result, plaintiffs filed a motion for a rule to show cause.

¶ 27 C. Stegall's Death and Probate Filings

¶ 28 On January 18, 2022, Stegall died. That same day, defendants filed the trust documents, and the next day, they filed a petition for probate of the pour-over will. On January 24, 2022, plaintiffs filed the probate action in the probate division of the trial court, seeking a will contest and alleging the trust documents were obtained by undue influence and were fraudulent. Plaintiffs attached as an exhibit a copy of Stegall's 2019 will devising property to the Rifle Club and the Diocese. That will nominated Stegall's friend and neighbor, Jon Haynes, as executor and Betty Moon, Stegall's cousin-in-law, as successor, should Haynes be unable to act as executor. Plaintiffs also filed the July 6, 2020, power of attorney executed in favor of Hessler. On January 25, 2022, plaintiffs filed a counterpetition for probate of the July 6, 2020, will, which named Hessler as executor. Plaintiffs also filed an objection to admission of the July 2, 2020, will. The court appointed Curtis Ford as temporary executor. The court consolidated the probate and declaratory judgment actions.

¶ 29                    D. Proceedings Following Stegall's Death

¶ 30          On January 26, 2022, the parties appeared before Judge Lane, who had inherited the case and held a hearing on the motion for rule to show cause based on defendants' failure to appear for their depositions. Meade invoked attorney-client privilege regarding the depositions. Tonny testified and conceded she was at the hearing where the depositions were ordered for December 9, 2021. She said she did not appear on December 9 because she was unavailable and believed or was told she did not have to attend because the case was pending an appeal. Penny testified she could not recall if she was in the courtroom on December 3, 2021. She did not appear for the deposition because something someone told her and research she did on a computer led her to believe everything was continued while they sought an appeal. Plaintiffs presented evidence Meade said at the December 9, 2021, deposition that he tried to call defendants, did not have reason to believe they were being evasive, and assumed there was a reasonable explanation for why they were not present.

¶ 31          The trial court expressed concern about the appearance that Meade incorrectly informed defendants they were not required to attend their depositions. However, the court also stated it was "not thrilled with the voluntariness of the answering of the questions" and found, "at this juncture[,] this was a stalling tactic." The court found defendants in indirect civil contempt, finding Penny lacked credibility, Tonny did not appear to wish to testify, and there had been a deliberate attempt to prolong the proceedings. The court ordered the depositions to take place on February 7, 2022. The court stayed sentencing for the contempt finding.

¶ 32          Defendants' depositions were taken on February 7, 2022. Defendants appeared at the depositions with new counsel, attorney James Nepple. However, defendants did not produce the requested documents and said Meade had not told them they were supposed to bring

anything.

¶ 33    On February 23, 2022, the trial court held a hearing to address multiple matters. In the probate action, Ford had filed a motion to admit the July 6, 2020, will as the last will and testament of Stegall. After some discussion, defendants' counsel did not object to admission of the will, and the court stated, "So by agreement, the July 6th, 2020 will will be admitted." The court's written order provided the will was admitted by agreement, "subject to any challenge to that Will that may be presented."

¶ 34    As to the contempt order, Tonny did not appear at the initial hearing to address sanctions and sentencing. Meade appeared and moved to withdraw as counsel. Meade told the trial court defendants had terminated his representation and filed an attorney discipline complaint against him. The court allowed Meade to withdraw as counsel.

¶ 35    Evidence concerning sanctions for defendants' contempt was held on multiple subsequent days. Penny testified Meade told them via conversation, text, or e-mail that they did not have to go to the deposition because the case was "in appeals." She said Meade did not tell them about documents they were required to bring to their depositions and did not remember previously being shown a list of documents. Likewise, Tonny testified Meade did not prepare defendants for the deposition or tell them to produce documents. She said he told them they did not have to go to the depositions because the matter was being appealed. Meade testified he met with defendants the day before the depositions and explained he had filed a motion for an interlocutory appeal, but it was still important for defendants to attend the depositions. Meade also stated he advised defendants of the documents they were required to bring to the depositions. He said he spent several hours with defendants, preparing them for the depositions.

¶ 36    The record indicates the hearing involving Tonny was contentious, and the trial

court warned Tonny on multiple occasions about her failure to answer questions and indicated she could be further held in contempt. At one point the court stated: "[T]hat's number three. Do you see that deputy in the back? If I ask him to get up and come forward, you're not going to like that. Okay. Answer his questions. That's the third warning. That's it."

¶ 37 In March 2022, plaintiffs reported the documents had been produced. In August 2022, the trial court found defendants had purged the contempt after the depositions were taken and the documents produced.

¶ 38 The trial court appointed F&M Bank as executor of Stegall's estate. When the Diocese and the Rifle Club filed their motion for leave to file a second amended complaint, F&M Bank moved to join the estate as a plaintiff in the second amended complaint. That motion was granted without objection, and the court specifically stated the complaint was amended to reflect the joinder of the estate in the action.

¶ 39 Defendants later moved to dismiss the second amended complaint, arguing, in part, the case was captioned with Stegall as a plaintiff instead of the estate of Stegall and the Diocese lacked standing. Plaintiffs responded, noting the trial court had previously granted the order for the estate to join the action. The court denied the motion, finding there was no good faith basis in law or fact to make an argument the estate was not joined. Shortly before trial began, defendants again alleged, in a motion for summary judgment, the action should be dismissed because the estate was a necessary party not named in the action. The court denied the motion. Also shortly before trial, the court referenced F&M Bank as having been substituted for Stegall.

¶ 40 In April 2022, defendants, through Nepple, filed a petition in the probate action to admit the July 2, 2020, will as the true will. The petition stated the July 6, 2020, will that had

been admitted to probate was signed under undue influence, fraud, duress, and coercion. Defendants asked the trial court to admit the July 2, 2020, will to probate and, if there were any objections, to declare a will contest and set the matter for trial. They also asked for a proof-of-will hearing regarding the July 6, 2020, will.

¶ 41 Also in April 2022, attorney Diana Vizcaino appeared on behalf of both defendants, and Nepple remained as Penny's counsel. On May 23, 2022, the trial court ordered all discovery be completed by July 11, 2022. However, by July 21, 2022, Nepple had withdrawn, and attorney Jeffrey Ryva entered an appearance on behalf of Tonny. Ryva filed a motion for extension of deadlines, noting he was new to the case and would be working with Vizcaino, who would be representing Penny. The court extended the deadline to August 1, 2022, and stated no further extensions would be granted.

¶ 42 In July 2022, Vizcaino served interrogatories with requests for production and sent over 20 subpoenas to various individuals. Plaintiffs moved to strike further discovery, arguing the matter was an attempt to delay the proceedings and harass them. The trial court granted the motion but extended the discovery deadline for two depositions.

¶ 43 Also in July 2022, Vizcaino moved to substitute another attorney to represent Tonny, stating she would remain the attorney of record for Penny. Defendants demanded a jury trial. Plaintiffs moved to sever the actions.

¶ 44 In early September 2022, the trial court severed the probate and declaratory judgment actions. The court set the declaratory judgment action for a jury trial with a final pretrial conference on February 17, 2023. In the probate action, the court found it had already admitted the July 6, 2020, will to probate and did not have authority to ignore the July 6, 2020, will and admit the July 2, 2020, will instead. The court further found there was no authority for it

to hold a proof-of-will hearing regarding the July 6, 2020, will. The court also found no right to a jury trial in the probate case. In a written order, the court noted concerns about defendants' failure to initiate discovery in the probate proceedings, finding there was no valid excuse for their failure to do so.

¶ 45   In the declaratory judgment action, the trial court granted defendants' demand for a jury trial. In response, plaintiffs withdrew a previous motion to amend their pleadings to remove requests for punitive damages. They stated they previously had withdrawn the request for punitive damages to try to expedite the process and, because that was not going to happen, they wished to reinstate it.

¶ 46   On January 18, 2023, attorney Theresa Sosalla entered an appearance as counsel for Penny. The record shows Vizcaino also remained as an attorney for Penny. Before the pretrial conference, defendants filed multiple motions to continue. The trial court denied the motions. At the pretrial conference, Sosalla asked for an accommodation for Penny because Penny had broken ribs. The court stated a claim of disability had to go before the court's disability coordinator. Vizcaino also withdrew as counsel.

¶ 47   On February 27, 2023, the morning of trial, Penny did not appear, and Sosalla stated there was no accommodation she could request for Penny to deal with side effects of tramadol, a medication Penny was taking that would impede her ability to participate in the trial. While Sosalla stated she had sought assistance from medical professionals, she did not provide details. Sosalla had an affidavit from a pharmacist about the side effects of the medication, but she admitted the pharmacist had not seen Penny or determined Penny was affected by the medication. Sosalla moved to stay the proceedings to allow Penny to heal. Plaintiffs noted they were ready for trial and argued defendants had established a practice of delaying the trial.

Plaintiffs noted a lack of evidence about the fractured ribs other than a nondefinitive medical report from February 9, 2023, which was provided just before the final pretrial conference.

¶ 48       The trial court noted the previous delays in the case and times when defendants failed to appear. The court then stated it did not believe Penny had a new condition and stated, "I am questioning whether or not this condition even exists with [Penny] because it seems like there's one issue after the other." The court further noted it did not have anything specifically stating Penny could not be there and there was never an actual request for an accommodation. The court stated if the rib fractures, which were known about on February 9, 2023, were serious, something should have been filed before the final hearings on the matter. The court noted it had heard 36 motions "because of continuances that were nobody's fault at that juncture" and noted concerns about last-minute substitutions of attorneys. The court further stated the case was two years old and was going to trial whether Penny appeared or not. Thus, the court denied the motion.

¶ 49       Before trial, defendants filed a motion *in limine* contending, in part, that Stegall's deposition was inadmissible hearsay. The trial court stated it would make rulings on the admissibility of evidence at trial. However, the court specifically ruled before trial defendants would not be allowed to present evidence regarding an alleged settlement offer with the Rifle Club.

¶ 50                         E. Plaintiffs' Evidence at Trial

¶ 51       On February 27, 2023, the jury trial began. During opening statements and closing arguments, plaintiffs used foam boards with pertinent dates and facts listed on them. In addition, one of those boards was titled "CON-GAME" and listed defendants as "CON-ARTISTS." That board was shown to the jury during closing arguments. Defendants did not

object to the use of the board.

¶ 52                                    1. *General Background*

¶ 53            Evidence at trial showed, in July 2020, Stegall was 94 years old. He had never married or had children. He was a lifelong member of the Catholic Church and was baptized at Sacred Heart Catholic Church (Sacred Heart Church) in Abingdon, Illinois, two days after birth and confirmed in 1936. Lee Brokaw, the priest at Sacred Heart Church, testified Stegall "didn't miss a Sunday," and was usually brought to church by Haynes or another neighbor. During COVID-19 shutdowns, masses were held outdoors. Brokaw testified when there were outdoor events in Abingdon, Stegall was there. Additional witness referred to Stegall as a "strong Catholic" and testified members of Stegall's family were "very instrumental in the Abingdon church" and the Catholic cemetery where Stegall was buried.

¶ 54            Stegall's father was one of the founders of the Rifle Club, which was located on 35 acres of land owned by Stegall. Stegall had real estate worth approximately $1.5 million to $2 million and had roughly $300,000 in certificates of deposit payable upon death to Sacred Heart Church.

¶ 55            Plaintiffs presented evidence Stegall previously told people he planned to leave his property to the Rifle Club and to Sacred Heart Church. Plaintiffs entered into evidence a copy of the 2019 will, in which Stegall devised to the Rifle Club the 35 acres it used for its activities and the remainder of his estate to the Diocese, to be used for the benefit of Sacred Heart Church. The will named Haynes as executor and Moon as successor if Haynes did not serve as executor. Also in 2019, Stegall executed a power of attorney for property in favor of Haynes.

¶ 56                                    2. *Early to Mid-June 2020*

¶ 57            On June 14, 2020, John Chaney, who was associated with the Rifle Club, visited

Stegall because it was both his and Stegall's birthdays. Chaney testified it was a tradition for him to visit Stegall each year on that date. He also would visit Stegall four or five times over the course of a year. On June 14, 2020, defendants were at Stegall's house when Chaney arrived. Prior to that encounter, Chaney had never seen defendants with Stegall. On June 17, 2020, Stegall executed a healthcare power of attorney in favor of Penny.

¶ 58          Haynes testified he was a neighbor and close friend of Stegall and he "truly loved" Stegall. He stated another neighbor, Hessler, was also a lifelong friend of Stegall. Haynes testified he and Hessler would visit Stegall and drink coffee with him. Haynes also grew hay on Stegall's land in 2020 and split the proceeds with him. Haynes said he was later told a different operator was going to farm the land. Haynes did not protest that because he knew Stegall would make more money from that venture. Haynes was not Catholic, but he took Stegall to church twice per week and was Stegall's power of attorney at the bank. Haynes described other ways he helped Stegall and testified he never accepted payment for anything. Haynes stated he never inappropriately appropriated money from Stegall and was never named as a beneficiary in any of Stegall's documents.

¶ 59          Haynes testified he never saw defendants with Stegall before 2020. Haynes testified, in June 2020, Stegall was in good health and had a good state of mind. However, in the middle of June 2020, Stegall was hospitalized. Sometime after, possibly around June 20, 2020, Haynes went to Stegall's house, and defendants arrived with Stegall. Defendants dragged Stegall to the porch, where he fell asleep and slept for a long time. Haynes said he had concerns about defendants' "constant attention" to Stegall.

¶ 60          During his testimony, Haynes related a time he encountered defendants' sister when he was trying to find an escaped bull. Haynes mentioned he had almost caught the bull on

Stegall's property, and defendants' sister said, "[M]y sisters told me about the old man and that he was theirs." The trial court sustained defendants' hearsay objection and told the jury to disregard the comment. Later, counsel for defendants moved for a mistrial based on the comment. The court denied the motion.

¶ 61                                    3. *June 28, 2020*

¶ 62          On June 28, 2020, defendants took Stegall to Tonny's attorney, Dennis Merkley, in Peoria Heights, Illinois. Defendants had a copy of Stegall's 2019 will and his power of attorney in favor of Haynes. Merkley made copies of those documents. Defendants also had tax assessment documents pertaining to Stegall's land. Merkley testified Stegall told him he wanted a trust but did not provide details. Merkley referred Stegall to the law firm of Davis & Campbell in Peoria, Illinois, for estate planning because he already represented Tonny. However, Merkley prepared a power of attorney for property in favor of Tonny, which revoked the previous one in favor of Haynes. That document would become effective upon a determination of Stegall's disability by a court or treating physician. Merkley said Stegall "wanted to make his own decisions," meaning Stegall wanted control over things. There was also some discussion between Merkley and defendants about Haynes concerning "payment for hay and farming and how that shook out." Merkley testified he asked defendants to step out of the room during the meeting while he talked to Stegall. Stegall signed the power of attorney without defendants present. Merkley testified he would have advised Stegall to take the new power of attorney to the bank.

¶ 63                                    4. *June 29, 2020*

¶ 64          On June 29, 2020, although Merkley had referred defendants to Davis & Campbell, defendants took Stegall to see attorney Michael Massie in Galva, Illinois. Massie testified a friend of his had recommended him to defendants. Massie met with defendants and

Stegall. Massie said Stegall appeared to trust and rely on defendants. Massie described Stegall as "relatively quiet, relatively passive," during the meeting but also "certainly interested in *** what was going on." He said Stegall expressed what he wanted to have done and did not appear to be influenced by defendants.

¶ 65    Among other documents, defendants gave Massie a difficult to read handwritten note from Steagall dated June 28, 2020, that appeared to read, with either misspellings or illegible letters due to poor handwriting, "I wold like togett all of my popety in a trust. Peromia Sacula Rom. C Forever." Brokaw testified *saecula* in Latin meant "for all ages." Brokaw read the word "Peromia" as "Peoria" and interpreted "Rom C" as "Roman Catholic."

¶ 66    In a deposition, Tonny testified Stegall told her he wanted a "forever trust," and said in Latin, "*Per omnia secula seculorum* [*sic*]." She said in her deposition she did not know what that meant, but she later testified it meant "forever." Brokaw, when questioned on cross-examination as to the meaning of *per omnia saeculorum* in Latin, stated it meant "forever and ever," and such a phrase might be on a grave. He said Stegall would not have used that term there because *saeculorum* was a theological term.

¶ 67    Massie took notes stating Stegall wished to give 35 acres to the Rifle Club and the remainder to unidentified charities via a trust. The plan was to have Stegall as the trustee and defendants as successor trustees. Massie testified the intent was for defendants to assist with the distribution to charities as successor trustees if necessary. There was no discussion of defendants becoming the sole beneficiaries of Stegall's property. Massie said the group was supposed to get back to him regarding the charities to leave property to, but there was no follow up after the meeting. Instead, defendants later told Massie to put the matter "on hold," and he never met with them again.

¶ 68    When asked if he had any concerns about performing the work requested, Massie stated the property power of attorney had been done just a few days before and, typically, all of the estate planning documents would be done at the same time. Massie wondered why the previous attorney had not done all of the work. However, he also stated defendants appeared to be people Stegall trusted and the existence of the power of attorney tended to confirm that.

¶ 69                                    5. *June 30, 2020*

¶ 70    On June 30, 2020, defendants took Stegall back to see Merkley to correct a typographical error in the power of attorney he drafted. On that date, Merkley also sent Brittany Miller, an attorney at the law firm of Davis & Campbell, the documents defendants had given to him. Merkley was not aware of defendants' consultations with other attorneys.

¶ 71    Jacque Dare testified she was a Knox County sheriff's deputy and was involved with an elderly services program. Through that program, Dare did checks on elderly people through phone calls or visits. On June 30, 2020, Hessler and Haynes each separately called Dare, seeking to add Stegall to the program. They each told Dare they had not seen Stegall for a couple of weeks. Dare went to Stegall's house, but he was not there.

¶ 72                                    6. *July 1, 2020*

¶ 73    On July 1, 2020, Miller met with Penny and Stegall. Her understanding was she would be drafting a will and trust with defendants as executors of the will. Miller testified "the vast majority of the information" portrayed to her at the meeting came from Penny. Miller's notes indicated Penny alleged Haynes was exploiting Stegall, possibly had keys to Stegall's house, and was "[b]ragging to neighbors" about Stegall being "worth a fortune" and a "big payment when he's gone." Miller's recollection was Stegall wanted to be named primary trustee over a trust with defendants named as successor trustees. Miller took notes indicating Penny

- 19 -

discussed various charitable causes, such as the National Rifle Association and the Red Cross, and stated the Rifle Club area was to be sold to "a like organization." However, other notes mentioned 35 acres and the Rifle Club and 85 acres and the Diocese.

¶ 74 Penny also provided Miller with Stegall's handwritten note about forming a trust. The notes indicated Penny used the term "Forever Trust." However, Miller did not recall discussing an irrevocable trust with Penny, and her notes included the term "Revocable." Miller testified an irrevocable trust could not be changed, while a revocable trust could have its terms changed in the future. If land were deeded into an irrevocable trust, the person putting it in trust would lose control over it. Throughout trial, other attorneys gave similar testimony. However, there was also testimony about various legal ways an irrevocable trust could possibly be changed.

¶ 75 Miller testified the matter was portrayed as having a sense of urgency. She said it was unusual to find out in the afternoon of one day that someone wanted to meet about estate planning and then start the plan the next day. Stegall did not say much at the meeting. Miller made a note a nurse had indicated concerns about Stegall's mental capacity, and her file included a note indicating the need for a doctor to determine Stegall was of sound mind. Miller said she mentioned to Penny there was a need to have Stegall evaluated concerning his mental capacity. She also had Stegall sign a form that would authorize transfers of files from the firm that prepared his 2019 will, which would have been completed had she continued work on the matter.

¶ 76 7. *July 2, 2020*

¶ 77 On July 2, 2020, Miller's firm received a call from Tonny who put Stegall on the phone. Steagall said, "I want to terminate my relationship," and Tonny got back on the phone and stated they were "going a different route." Tonny said Merkley would call Miller's

- 20 -

supervising partner at the firm and that no more work was to be done for Stegall.

¶ 78     During the morning of July 2, 2020, Tonny spoke to a person at the Knox County State's Attorney's Office about obtaining a protective order against Haynes, but she was not successful in obtaining one. Haynes later learned from Dare defendants attempted to get an order of protection against him, which he said was "hogwash." Defendants next took Stegall to the bank.

¶ 79     Linda Glisan, an employee of Tompkins State Bank in Abingdon, testified she had helped Stegall with his banking needs for many years. Stegall had a checking account and over $300,000 in certificates of deposit at the bank that were payable upon his death to Sacred Heart Church. Glisan testified a power of attorney could remove pay on death certifications from accounts. On July 1, 2020, Haynes had called the bank, and afterward, Glisan put out an alert in the bank system concerning potential suspicious activity with Stegall's accounts. On July 2, 2020, Glisan was informed Tonny and Stegall wanted to present a power of attorney for Stegall at a drive-up window at a bank branch in Galesburg, Illinois. Glisan told the teller to inform Stegall to come to the Abingdon office and she would take care of the matter for him. No one ever came to the office to do that. Glisan reported the matter to law enforcement and spoke with Dare.

¶ 80     Also on July 2, 2020, at 1:30 p.m., defendants took Stegall to meet with Stephen Holland, an attorney in Bushnell, Illinois. Holland testified, at 10 a.m. that day, Mike Steelman from Farmers & Merchants State Bank called and said he had referred Tonny to Holland because Stegall needed a trust as soon as possible. Holland took notes based on his conversation with Steelman regarding alleged threats from Haynes and Stegall's desires for a trust. Steelman testified, when he spoke to Tonny, she seemed genuinely concerned about Stegall.

¶ 81 Before meeting with defendants and Stegall, Holland prepared a revocable trust, a pour-over will, which would devise anything in Stegall's estate into the trust, and a deed. The trust had Stegall as trustee and defendants as successor trustees. Defendants would receive Stegall's property upon his death. Defendants knew they would be the beneficiaries of the trust. Holland also testified that was what defendants asked for.

¶ 82 When Holland met with the group, he said there was no question in his mind Stegall knew what he was doing. He testified Stegall said Haynes was threatening him, but Holland did not put that in his memo memorializing the meeting. Holland made a note not to record the deed immediately. He testified he needed the full legal description and defendants were concerned Haynes would see any deed that got recorded and cause problems. Thus, defendants wanted Holland to hold off recording the deed. Holland was instructed to bill Tonny. Holland testified the trust would not be funded until the deed was recorded.

¶ 83 During the meeting, it was decided to make the trust irrevocable. Holland testified he explained the difference between a revocable and irrevocable trust to Stegall and Stegall understood what that meant. Holland asked defendants to leave the room so he could speak to Stegall and ensure Stegall was acting on his own free will. Stegall appeared to understand what was happening. At no time did Stegall or defendants tell Holland Stegall wished to retain control over his property.

¶ 84 No one told Holland Stegall had been to multiple attorneys over a few days. Holland stated, had he known, he would have been concerned, because it would appear they were "out shopping attorneys." He also would have been concerned had he known an attorney on July 1, 2020, would not do further estate planning without Stegall being seen by a doctor or had he known Stegall would later be treated for dehydration.

¶ 85        Holland testified Stegall told him he wanted to make sure the Rifle Club received 35 acres of land. Holland testified the irrevocable trust would not allow that without permission from the trustees and beneficiaries. However, Holland wrote in a memo memorializing the meeting, "He asked if we could make changes later on to include that clause and I said that we could." Holland testified the memo was in error and should have read "could not." Holland also provided a letter to Stegall about the documents, stating they could not be changed. Stegall had not yet signed the documents at that time, but he then went ahead and signed them.

¶ 86        Defendants next took Stegall to the Fulton County Sheriff's Office to attempt to get a protective order against Haynes. In doing so, they left the papers Stegall signed in Penny's car. The letter Holland wrote accompanying those papers went missing and was never accounted for. In her deposition, Tonny said she did not read the documents until January 2021. However, she admitted, when she left Holland's office on July 2, 2020, she knew Stegall had changed his will to make her and Penny beneficiaries. Tonny stated Stegall wanted her and Penny to have and take care of all of his property after he passed away.

¶ 87        Penny also stated in her deposition she did not look at the documents at the time, but she understood Stegall was leaving everything to defendants. Penny explained in her deposition why they went to multiple attorneys, stating, "We're perfectionists. I mean, if someone's not doing, you know, whatever, you can get rid of them. We fired doctors before. I mean, we don't have to just settle for the first thing that comes along or whatever." Penny stated the church had been closed for several months because of COVID-19, and Stegall was not going to church at that time.

¶ 88        Meanwhile, a well-being check for Stegall had been called in. Dare received a call that Stegall was in the lobby of the Fulton County Sheriff's Office and told the caller to reach out

to family members to pick up Stegall.

¶ 89        Moon testified she was Stegall's cousin-in-law. When Moon lived in Illinois, Stegall ate dinner with her family every Sunday. Moon stated Stegall was very private and she did not know what he intended to do with his property upon his death. On July 2, 2020, Moon's son-in-law, David Van Woert, spoke to a Knox County sheriff's deputy on the phone who was looking for Moon. David gave the deputy the phone number of his wife, Linda Van Woert, who was Moon's daughter. They later received a phone call from the Fulton County Sherrif's Office asking them to pick up Stegall.

¶ 90        Moon, Linda, and Linda's brother drove to pick up Stegall. Moon testified Stegall was happy to see them and had not had anything to eat or drink. Linda said he looked tired, but he recognized her. Moon and Linda testified they did not know defendants and had never seen them at Stegall's home. Linda testified she was a registered nurse. She said she knew Stegall had a leg catheter and they did not know where he had been all day. Linda said the temperature had been in the 90s that day with a high heat index and Stegall reported eating only a cookie and not drinking anything. Linda was concerned Stegall could be dehydrated and felt he should be checked out at the hospital.

¶ 91        Stegall agreed to go to a hospital. He received intravenous fluids, which could address dehydration. Linda testified dehydration could contribute to confusion. After Stegall was discharged, he went to Moon's home, where he stayed the night. He did not have any papers or the trust documents with him.

¶ 92        Records from the hospital visit stated Stegall had mild hyponatremia, which a physician testified was low salt levels and could affect mental status. However, a doctor's note stated Stegall was alert and oriented to person, place, and time. In a deposition, a doctor

identified a note by a nurse that stated, "[P]atient states that he possibly thought that people were trying to get his money, but he gets confused and could possibly take advantage of him." Hospital records also noted Stegall was worried people were going to take advantage of him, but he denied Tonny tried to hurt him in any way. Stegall told the doctor he ate lasagna at noon but did not eat supper.

¶ 93 David stayed at the farm while the others were picking up Stegall. During that time, a family friend, Danny Boone, came to the farm. Boone was married to a sister of defendants. Boone gave David an envelope, stating defendants wanted him to have it. Inside was a copy of Stegall's 2019 will, which left his property to the Rifle Club and Sacred Heart Church and named Haynes as executor, with Moon as successor. Also included was a power of attorney.

¶ 94                                   8. *July 3, 2020*

¶ 95 On July 3, 2020, David spoke to Penny, who told him she wanted him to have the documents that were delivered because she felt they showed Haynes was trying to take control of Stegall's money. David told her he disagreed. Penny also told David she felt Moon was not looking out for Stegall's best interests because his house was a mess. David agreed the house was a mess and had been on other previous occasions. Penny did not mention any new documents being drafted on July 2, 2020.

¶ 96 After David spoke with Penny, the family took Stegall home. When they got there, the Hesslers and Haynes were there. The group discussed with Stegall what he had done the day before, and Stegall was unable to remember anything other than to say he had been driving around with defendants all day. Linda testified Stegall appeared confused. She conceded on cross-examination it was possible Stegall did not tell them what happened because he was a very private person. However, she also stated Stegall was not a person who was likely to give up

control over his real estate. Over defendants' hearsay objection, David testified Stegall said it was not his wish for defendants to have a full power of attorney over him.

¶ 97 Based on their current knowledge of events, the group felt they should contact an attorney to address what happened the day before and revoke anything Stegall might have signed. With Stegall's consent, the group consulted with Blake, who had prepared Stegall's 2019 will. Stegall then executed a new power of attorney. Based on Blake's advice, Stegall also signed a document stating he revoked any and all powers of attorney appointing defendants as his agent.

¶ 98 Glisan testified she went to Stegall's home to notarize the new power of attorney. When she did so, she talked to Stegall separately and asked him questions to ensure he was of sound mind and knew what he wanted to do. Stegall told Glisan he wished to revoke the power of attorney he had given to Tonny. On July 28, 2020, Glisan received a certified package from Tonny with her power of attorney in it. Glisan sent a certified letter back stating the power of attorney had been revoked and Tonny would have to speak to Stegall or Stegall's attorney about it.

¶ 99 Also on July 3, 2020, Haynes sent a text to Boone because they were "buddies." Haynes asked Boone to tell defendants and their brother their powers of attorney had been revoked, a protective order had been placed on all three, and if they had any contact with Stegall, they would go to jail. He also stated Stegall kept a $20 gold piece in a safe. Haynes stated if it was missing, they would be charged and stated, "I'm sorry this happened." Haynes admitted he did not actually have an order of protection against defendants or their brother. He said he wrote that to protect Stegall because he felt defendants were taking advantage of him. He said his intent was to get a protective order the following Monday, but then a friend in law enforcement told him it would be "an all-day affair." Haynes did not want to put Stegall through that, so the

statement about the protective order ended up being false. Haynes said he included the part about the coin because defendants' brother had previously bragged sometime around June 20, 2020, that he had sold a bunch of coins.

¶ 100                                    9. *July 5, 2020*

¶ 101          On July 5, 2020, Dare met with Stegall at his house. Haynes was there, and Dare signed Stegall up for the elderly services program. Stegall seemed fine and also seemed comfortable and at ease with Haynes. Dare had also received a call that day for a well-being check on Stegall from defendants, so she called Tonny. Tonny told Dare to talk to Tonny's attorney. Dare told Tonny she was not questioning her and was calling about the well-being check, and Tonny repeated Dare should give the information to her lawyer. Dare never said anything to Tonny about a warrant for her arrest, and the record indicates there never was any such warrant at that time.

¶ 102                                10. *July 6 and 7, 2020*

¶ 103          On July 6, 2020, Stegall came to Blake's office with Haynes, Moon, and Hessler. Blake testified Stegall had no documents in his possession and was not sure of what he might have signed on July 2, 2020. At that time, no one knew about the trust documents. Stegall told Blake he wanted to reexecute his 2019 estate plan. Blake prepared a financial power of attorney naming Hessler as the first agent and Haynes as the second choice. Blake stated "there had been some allegations" about Haynes and Stegall felt more comfortable with Hessler, who he had known for a long time, as the first choice. Haynes did not have any negative reaction to that. Haynes, Hessler, and Moon were not devised anything under the 2019 or July 6, 2020, wills.

¶ 104          Blake testified an irrevocable trust was often used when trying to get assets out of a person's estate for things like Medicaid planning, which was not relevant to Stegall. When

property is put in an irrevocable trust, the grantor is then unable to do anything with the property other than what is said in the trust. Creating an irrevocable trust the first time a client came in was not a common practice.

¶ 105        Also on July 6, 2020, Tonny left Holland a message stating she had been unable to contact Stegall because "the bully" said there was an order of protection against her. On July 7, 2020, Tonny called and said to hold off on doing anything more with the real estate and Holland would receive a call from another attorney, Mike Doubet. Holland met with defendants, who provided him with the 2019 will and expressed concerns about it. They also told Holland that, after they left his office on July 2, 2020, they had unsuccessfully tried to get an order of protection against Haynes in Galesburg and had gone to the bank to file the power of attorney, but it was not accepted. Later, they went to the Fulton County Sherrif's Office to try to get an order of protection. While there, they met with a counselor concerning senior abuse. During that time, they were told Haynes picked up Stegall at the sheriff's office. Tonny reported Dare told her there was a warrant for her arrest for stealing money from Stegall's account. Defendants told Holland Mike Doubet would be representing them and mentioned Merkley. Tonny told Holland she had a "throw away phone" because she was concerned her regular phone "had been tapped into."

¶ 106        Holland had no further contact with defendants or Stegall. However, in January 2021, Cassidy contacted Holland asking for the deed because he was going to be filing a guardianship proceeding.

¶ 107        The record indicates that, during the remainder of 2020, defendants did not visit Stegall. They began doing so again after the trust documents came to light in 2021 and the deed was recorded.

¶ 108                              11. *Events of 2021-22*

¶ 109          Cassidy's deposition was read to the jury without any general objection to the use of it. Cassidy testified, on January 12, 2021, Tonny, and possibly Penny, came to his Peoria office with the trust documents and deed. Defendants were concerned about the power of attorney having been superseded by a different one and expressed concern Hessler and Haynes were taking advantage of Stegall. They also indicated Haynes and Hessler were possibly isolating Stegall. Because there had been a sequence of multiple powers of attorney executed in such a short period of time, Cassidy was worried Stegall was willing to sign any documents put in front of him. As a result, Cassidy recommended guardianship proceedings.

¶ 110          On January 14, 2021, Cassidy filed documents seeking to appoint Tonny as Stegall's guardian. The petition purposely did not allege Stegall had dementia. Cassidy said the purpose of the proceeding was to find out if Stegall was competent and for him to tell a court what he wanted in order to "stop this ping ponging of powers of attorneys going back and forth."

¶ 111          After the initial meeting, Cassidy reached out to Holland, seeking the original deed. Holland arranged for Tonny to pick up the deed. Cassidy also confirmed Holland believed Stegall had a present donative intent when he signed the deed, and Holland had no objection to Cassidy adding a legal description and recording it. Cassidy was not aware of Stegall's visits to other attorneys or that Stegall had not retained the trust documents after he met with Holland.

¶ 112          Meanwhile, on January 15, 2021, Blake saw Stegall because the deed drafted by Holland had been recorded, and that was the first indication to him a trust existed. In addition, Hessler had been served with a petition to have Stegall adjudicated a disabled person. Blake then initiated the declaratory judgment action. Blake testified, shortly after the lawsuit was filed, Stegall called him and indicated he did not want Blake to represent him any further. Blake

testified he asked Stegall, "[C]an you indicate to me why you do not want me to represent you?" Stegall responded, "I don't think that I can." Blake asked Stegall if either of the defendants was present, and Stegall answered in the affirmative. Blake asked Stegall to come to his office to discuss the matter outside of anyone else's presence. Stegall later came to Blake's office. Stegall was polite and able to give competent answers to Blake's questions. Stegall remained represented by Blake at that time. However, defendants later moved to disqualify Blake because he would be a necessary witness at trial.

¶ 113        On February 12, 2021, Cassidy saw Stegall and defendants at Stegall's home. Stegall did not do anything to suggest he did not want defendants there. Stegall said he was fine with the guardianship proceedings. Cassidy was also present when Egan interviewed Tonny. Cassidy initially represented defendants in the declaratory judgment action but withdrew shortly after because he did not want to be involved in defending an irrevocable trust, and defendants had also relieved him of his duties.

¶ 114        Egan testified he met with Stegall on February 3, 2021, informed Stegall of his rights, and explained Egan's role as GAL to Stegall. Haynes was present at the time. Haynes did not attempt to interject himself into the process, and Stegall did not appear to be influenced by Haynes's presence. Stegall's house was very cluttered and dirty. Egan testified Stegall wanted to remain independent as long as possible. Stegall was hard of hearing, but he seemed to comprehend what Egan told him. Stegall identified Hessler and Haynes as his friends.

¶ 115        Egan interviewed Tonny, who described Stegall as a lifelong family friend, "who had spent holidays together and birthdays and things like that." However, that was not consistent with what Stegall reported. Stegall's account of meeting Tonny was that someone from the church had introduced them and she met Stegall because she wished to use the shooting range on

his property. No one else Egan interviewed indicated defendants had been close to Stegall for more than a year or two. Most of the people Egan interviewed did not recall seeing defendants with Stegall before the past few years and described the relationship as recent.

¶ 116    Egan testified Tonny reported she believed Stegall was being abused or exploited, was concerned about the condition of Stegall's house, and "had a lot of negative things to say about [Haynes]." However, Egan found Tonny "was very lacking in any of that detail." Egan also could not get any names of people who could verify what Tonny told him. Egan found it important defendants might benefit from Stegall's death, especially since whoever was appointed guardian would be in charge of Stegall's finances and assets.

¶ 117    Tonny told Egan she did not know she was a trustee under the July 2, 2020, will. Egan did not find that statement credible. Egan noted an irrevocable trust could be changed if all parties to it agreed. He asked Tonny if defendants would agree to change the trust to revert to the original intent of the 2019 will to leave Stegall's property to the Rifle Club and the Diocese. Egan said, "[W]e never had a consent on that," and, "[S]he did note that what she saw in those documents was what [Stegall] wanted." However, from his interview with Stegall, Egan did not think that was what Stegall wanted. He testified Stegall "was under the impression that everything would go to the church and to the gun club."

¶ 118    Egan met with Stegall again in late February 2021 and spoke with Stegall privately. Stegall did not recall any history with defendants' family or with defendants' father. Stegall also gave a different account of how he met Tonny, stating he contacted her because he needed help with his finances. From his investigation, Egan believed Stegall may have been referring to his real estate taxes. Egan asked Stegall who he spent time with, and Stegall mentioned the Hesslers and said Haynes took care of him sometimes. He did not mention

defendants. Stegall repeated his impression his property would be left to the Rifle Club and the Diocese. He did not remember much about his visits to lawyers the previous summer.

¶ 119    Egan asked Stegall about the trust documents giving control of his property to defendants. When asked what Stegall's reaction to that was, Egan stated, "[H]is words were, he'd like to just throw that out when I described that his property was not going to the church and the gun club." Stegall continued to maintain his wish was not to be subject to too much control, and he wanted to remain independent. Stegall was making his own decisions about the crops and activities on his farmland. Egan felt Stegall had a strong grasp of family history and a strong long-term memory, but his short-term memory was "starting to fade." Egan received a physician's report consistent with his observations. He reported Hessler was not willing to serve as Stegall's guardian.

¶ 120    On March 11, 2021, Egan went to Stegall's home because he had received a report cameras had been placed inside the house. Dare also met him there. Tonny had also stated in her interview defendants had padlocked parts of the property to protect assets around the house. Egan found three cameras inside the house he described as a "camouflage trail camera" and two very small "surveillance-type cameras." The cameras were in a position to capture Stegall's movements in his kitchen and bedroom. They also could transmit audio, such that someone could speak to Stegall through them. There were also some locks present on the property. Stegall initially was not there, but he then arrived with defendants. Egan asked defendants questions and received "[c]urt, one-word answers." Defendants stated they had installed the cameras. Egan wrote to Cassidy about the cameras, stating they should be removed immediately. Egan talked to Stegall about the cameras and said Stegall thought the cameras meant he was in danger, and Stegall wondered why anyone would be "out to get [him]." The

cameras were later moved to the outside of the house.

¶ 121      The deposition of Jeffrey Hershkowitz, an internal medicine physician, was read to the jury. Hershkowitz saw Stegall in February and March 2021, in connection with the guardianship proceedings. One of the defendants accompanied Stegall to the appointments. In a report, Hershkowitz wrote Stegall was alert but seemed slow to process information. Hershkowitz noted various physical issues and checked a line stating, "Guardianship is needed." In regard to the type of guardianship, he wrote "limited with regards to finances." Hershkowitz stated, based on his discussions with Stegall since 2013, he felt Stegall "probably needed a little help with regards to his financial situation." He also recommended Stegall receive home healthcare visits. Hershkowitz was not asked to perform any mental competency tests and did not perform any. However, he opined, in 2020, if things were made very simple for Stegall to understand, he could probably sign and understand documents.

¶ 122      Haynes testified, in 2021, defendants were at Stegall's house "24/7." Before January 2021, Haynes would still have coffee with Stegall, but he did not do so from January 20, 2021, until the time of Stegall's death. Haynes said when the cameras were installed, people did not visit Stegall because they did not want to be recorded. Haynes learned he would not make hay on Stegall's property in 2021 from a letter from a farm service agency. Haynes learned from another person Tonny had reached out to the new operator because by then defendants had the property in trust.

¶ 123      Chaney testified he saw Stegall and Penny at the shooting range on June 14, 2021. At that time, Penny told Stegall, "[T]hese are the guys that are suing you." Chaney stated Stegall asked if that was correct, and Chaney told him no, that was not right. Chaney told him the Rifle Club was suing on Stegall's behalf. Chaney testified Stegall then "didn't really have a reaction

physically or he didn't say anything. He just sat there real quiet."

¶ 124    When Stegall died, Brokaw indicated he was not allowed to give last rites to Stegall, possibly because of the ongoing litigation. He said defendants were controlling Stegall's affairs.

¶ 125                                    12. *Stegall's Deposition*

¶ 126    As part of the plaintiffs's case, Stegall's deposition was read to the jury. In his deposition, Stegall testified he was a lifelong Catholic and attended Sacred Heart Church. He was also a member of the Rifle Club. Stegall's father previously let the Rifle Club use his land without charging them rent. Stegall initially said he could not recall using Blake Law Office for legal services, but he then recalled having a will done.

¶ 127    Stegall testified he had known Tonny for about 40 years. When asked how he was first made aware of Tonny, he stated a neighbor told him she was a lawyer, but he was unclear or seemed confused about when he was told that. Stegall knew of Penny around the same time because she was Tonny's sister. Stegall stated defendants had guns, were "gun nuts," wanted to join the Rifle Club, and came to his house seeking a place to shoot their guns. The date of that event was unclear. Stegall stated, in the past year, he had seen defendants more often.

¶ 128    When asked about the 2019 will, Stegall did not recall devising land to the Rifle Club but remembered devising land to the Diocese. Stegall testified, in the summer of 2020, defendants took him to a law firm in Peoria. He could not remember what they did there but thought he signed his name on something. When shown the power of attorney he signed in favor of Tonny, Stegall did not recall why he signed the document and said, "I guess I would say that's a bad thing to sign your name to anything." He indicated he did not know he was giving Tonny the authority to handle his property when he signed the document.

¶ 129    Stegall vaguely remembered talking to Miller, and he said defendants must have taken him there. He said defendants picked the lawyers he talked to. He said he did not know exactly what an irrevocable trust was and no one ever explained what one was to him. He agreed he signed things he did not understand and wished he had not signed. Stegall generally did not remember the details of any of his visits with attorneys.

¶ 130    When asked if defendants previously did favors for Stegall, he replied, "Well, I think they must have been, but I can't tell you what it was." He did not recall them bringing him groceries, shopping for him, or taking him to the doctor. However, he recalled defendants putting cameras in and around his house. He also indicated defendants changed the locks on his house and stated, "I don't even have a key or anything to get in my own house." Stegall indicated he thought Penny worked at the bank but later indicated he could not think of the name of the person at the bank and, when given Glisan's name, stated she was who he was thinking of.

¶ 131    As to the July 6, 2020, will, Stegall recalled devising land to the Rifle Club and the Diocese and stated that was his current desire. He stated he never intended to leave all of his land or money to defendants or give them control of his bank accounts.

¶ 132    13. *Admission of the July 6, 2020, Will Into Evidence*

¶ 133    Following Blake's testimony, plaintiffs offered the July 6, 2020, will into evidence. Defendants objected because the will had not been subjected to a proof-of-will hearing. Plaintiffs noted they were not offering evidence the will had been admitted to probate and there was no reason for the jury to assume the document was a probated will. The trial court allowed admission of the will into evidence.

¶ 134    F. Motion for Directed Verdict and Amendment of Pleadings

¶ 135    After the close of plaintiffs' case, defendants moved for a directed verdict,

arguing, in part, plaintiffs had not proven fraud as set forth in their complaint because the only allegation was defendants misrepresented to Stegall he could change the irrevocable trust. Plaintiffs noted additional evidence of fraud had surfaced during trial and suggested they would move to amend the complaint to conform the pleadings to the proof. Defendants took issue with that suggestion, arguing they would have done additional discovery had they known additional facts concerning fraud would be alleged. The trial court stated, "[T]he evidence can conform the pleadings." The court denied the motion for a directed verdict.

¶ 136        Later, after most of defendants' witnesses testified, but before Tonny's testimony, plaintiffs filed a motion for leave to amend the pleadings to conform to the evidence and attached a third amended complaint, adding additional allegations of fraud. The trial court heard argument on the matter after the defense completed most of their evidence. Defense counsel opposed the amendment, arguing it prejudiced them because they did not enter evidence that would have contradicted the new allegations. The court found there was no surprise presented by the amended pleading and stated the pleadings could be amended to conform to the proof before judgment. Thus, the court denied the motion.

¶ 137                          G. Defendants' Evidence at Trial

¶ 138        Tonny testified she worked as a dentist. She explained Penny had not been present in court because she had broken ribs. Tonny stated her father talked about the Stegall family a lot when she was a child. When she was a teenager, she began to visit Stegall with her father. Tonny's father was the same age as Stegall, and they both had served in the military. Tonny testified she continued visiting Stegall as an adult. She stated Stegall attended events held by her family, including holidays, and she would visit Stegall on his birthday. Tonny described examples of various events and visits and stated, "He was like family to us." When Tonny's

father was ill, Stegall kept track of his health by calling defendants. Tonny testified Haynes brought Stegall to see her father at Tonny's house when her father was sick. Stegall attended the funerals of both Tonny's mother and father.

¶ 139    Tonny testified Stegall was upset the church closed during the COVID-19 pandemic and defendants spent more time with him then. Defendants visited Stegall on his birthday in 2020. Tonny said there were no other people present while she was there. That night, Hessler took Stegall to the hospital. Penny took him home a few days later when he was discharged. After that, Stegall told defendants he wanted to become a patient at the Veteran's Administration and started talking about "making documents." Tonny said Stegall showed her his 2019 will and power of attorney, along with a farming agreement with Haynes concerning hay. She said Stegall was concerned he made only a few thousand dollars from the hay, which was not enough to pay his property taxes. Tonny said Stegall called Haynes "a shyster." Tonny recommended Stegall see a lawyer and set up an appointment for Stegall with Merkley. Tonny testified Stegall wanted the power of attorney with Haynes revoked. Tonny stated Stegall spoke for himself at the appointments with attorneys.

¶ 140    Tonny testified they met with Massie because Stegall wanted an attorney outside of Galesburg and Penny found Massie after making some phone calls. Massie did not complete the trust documents because he was too busy to do the documents right away, and Stegall wanted them done quickly. Tonny said when they met with Miller, Stegall had told her the charities he wanted his property to go to were "veterans, NRA, Red Cross, and the Catholic Church within 35 miles of Abingdon." Tonny testified Miller wanted Stegall to have a medical examination to show his competence because of his age. She indicated she could not get an examination scheduled quickly and it would take many weeks for Miller to complete the documents. Tonny

said Stegall did not want to wait that long and wanted a trust as soon as possible.

¶ 141          Tonny testified, on July 2, 2020, Stegall told her Haynes had stopped by and told him not to go anywhere with defendants. Haynes said he was going to get another person who had previously farmed Stegall's property and who worked for Haynes and said, "[W]e're gonna straighten you out." Stegall then left with Penny with the intent "[t]o get his forever trust done." Tonny contacted Steelman because his bank had a trust department. Tonny stated Stegall was afraid to go home, so they went to the Knox County Courthouse to seek a protective order. They were told to go to an agency called Safe Harbor for help with the forms. Penny went to get food for the group while Tonny and Stegall were at the courthouse.

¶ 142          After visiting the courthouse, the group went to the drive-up window at the bank, and Stegall gave them the power of attorney, but it was not accepted, and they were told they needed to speak to Glisan in Abingdon. There was no attempt to remove any funds. Tonny said they did not go to Abingdon because they lacked time before their appointment with Holland.

¶ 143          Tonny testified defendants did not recommend a specific type of trust to Holland or suggest Stegall sign something that could not be amended. However, she admitted they knew they would get Stegall's land when he died. Holland spoke with Stegall alone and returned with some papers. Stegall did not show them to defendants and left them in Penny's car. Afterward, the group went to Safe Harbor, where they were told it would take hours to fill out the paperwork and it could not be done that day. Tonny stated Stegall wanted to go home but was concerned Haynes would be there, so she called a sibling to go check, and the sibling reported Haynes was there, "standing in the driveway with his hands on his hips." Tonny said she called Merkley and asked him what to do and then went to the Fulton County Sheriff's Office to seek a protective order.

¶ 144 Tonny testified Stegall told an officer he wanted a protective order. After waiting for about an hour, one of the employees took Stegall to ask him some questions. After that, Tonny did not see Stegall again until January 2021. In between, there were allegations she committed elder abuse, and she was separated from Stegall during that time.

¶ 145 Tonny testified, on July 3, 2020, she was shown the text message sent by Haynes, which upset her. Tonny also received a message from Dare to come in for questioning because the bank reported her for elder abuse. Tonny said she called Merkley, who said he did not handle protective orders and recommended she contact Doubet. Tonny contacted Doubet and then called the Knox County Sherriff's Office and told them they should direct any questions to Doubet. Tonny testified she was not contacted again for any questioning and charges were not brought against her or Penny. Tonny stated they still feared they would be arrested because Haynes was friends with Dare. Although Tonny testified they stayed away from Stegall because of Haynes's text, she admitted Penny checked with the Fulton County Sherriff's Office on July 4, 2020, and was told there were no protective orders against them.

¶ 146 Tonny testified, in August 2020, defendants asked Hessler if he would take them to visit Stegall and he told them no. At Christmas 2020, she asked a relative, Glen Carnes, to take a card and gift to Stegall, and she put a note in the card stating Haynes had said defendants would be arrested if they contacted Stegall. Carnes testified he took the card and gift to Stegall. He said, after Stegall read Tonny's note, Stegall seemed concerned and said, "[T]hat explains a lot of things."

¶ 147 Tonny testified, "at some time," defendants located the folder Stegall had left in Penny's car. In January 2021, defendants became concerned something was going to happen with Stegall's property and that it might be "logged," when Stegall had previously said he did

not want that to happen to his property. They also were concerned about his well-being, so they met with Cassidy. As a result, Egan was appointed GAL and Ford was appointed as temporary guardian for Stegall. Tonny denied her answers were curt and short when she spoke with Egan. She did not know what happened to the letter Holland wrote to Stegall explaining the trust documents.

¶ 148        By the third week of January 2021, Cassidy told defendants "[they] had every right to go to [Stegall's] property". Tonny said Stegall "was not in good shape." Tonny testified defendants bought groceries for Stegall, cleaned, and cared for him throughout 2021. Stegall was dependent upon them during that time. Tonny took photos depicting the condition of the house.

¶ 149        Tonny testified defendants installed cameras on Stegall's property because they were being falsely accused of abuse. Stegall was also leaving his stove on, and they wanted a camera there for his protection. Tonny said there were signs stating video recording was in progress. She said, from the cameras, they had evidence of many visitors, including Haynes and Hessler.

¶ 150        On January 1, 2022, Tonny found Stegall on the floor by his bed, and he was taken to the hospital. Ford, as temporary guardian, had control of Stegall's healthcare at that time. Defendants visited Stegall two days before his death at a nursing home. Tonny testified the nursing home informed her no one else had visited Stegall. She said she did nothing to prevent Brokaw from performing last rites. Tonny testified defendants' intent regarding the trust was to use it for charitable purposes, as Stegall intended. During Tonny's testimony, the trial court admonished her multiple times to answer the questions without elaborating.

¶ 151        Jerald Spolar, a dentist, testified he practiced dentistry with Tonny and was engaged to her for five to seven years. Spolar testified he became acquainted with Stegall

"probably 15 years ago." Spolar had previously seen Stegall's truck at the Williamsons' family home. He said he saw Stegall and defendants' father together at Williamson family functions. He stated "they were just like bookends" that could not be broken apart and had prior military service in common. Spolar described defendants' relationship with Stegall as "very, very close," and stated Stegall was like a father figure to them. In 2014, Tonny had written a book about her father, and Stegall was at a book signing event. When defendants' father passed away in September 2019, Stegall attended the funeral and appeared to be very sad. The record shows Stegall signed an attendance sheet at the funeral.

¶ 152 Spolar witnessed Stegall sign the power of attorney prepared by Merkley on June 26, 2020. Stegall did not appear to be controlled by defendants. Spolar said defendants were upset and heartbroken when they were unable to visit Stegall between July 2020 and January 2021.

¶ 153 Jan Renee Westbay, defendants' niece, testified she went with Tonny to visit Stegall when she was a child. Stegall was also in attendance at a birthday party for defendants' father in July 2016. She described defendants' father and Stegall as good friends. Westbay also saw Stegall at defendants' father's funeral. Additional witnesses testified about seeing Stegall at Williamson family events and about visits by family members to Stegall's home.

¶ 154 Mike Hackmann, a former physician at a local veteran's affairs clinic, testified Tonny contacted him in the summer of 2020, seeking information on how to enroll a person in the Veterans' Administration's healthcare system. Meanwhile, Rex Kilburn, an acquaintance of defendants, testified he was hired by defendants to perform repairs at Stegall's home in the spring of 2021. Penny was there and seemed to be taking care of Stegall.

¶ 155 At the close of evidence, the trial court denied motions for a directed verdict from

both plaintiffs and defendants.

¶ 156                    H. Additional Trial Issues

¶ 157                    1. *Motions for Substitution of Judge*

¶ 158        During the course of the trial, defendants moved to substitute Judge Lane for cause three times.

¶ 159        In the first motion, filed in April 2022, defendants alleged Judge Lane showed bias against them, primarily by (1) threatening them with contempt if they did not answer questions, (2) asking questions of defendants implying they must waive their attorney-client privilege, and (3) yelling or rolling his eyes in response to statements by defendants. Defendants also stated they had previously hired and fired Judge Lane's former law firm and they believed that caused Judge Lane to be biased against them. Defendants attached transcripts of the hearings. They also included a declaration in support of the petition, but it was not notarized.

¶ 160        A different trial judge held a hearing. Defendants did not ask to present witnesses. The trial court noted there was a lack of an affidavit from defendants and found the petition was not timely filed and lacked merit on its face. The court noted the petition alleged matters that had occurred months back and was filed on the day the action was set for a hearing. The court stated, while it was not finding the petition was filed in bad faith, the filing of a petition for purposes of delay would be a valid basis to deny it.

¶ 161        In October 2022, defendants filed a second motion to substitute Judge Lane for cause, alleging Lane (1) sent two e-mails telling counsel he would not allow her to appear via Zoom unless she settled all outstanding issues with opposing counsel, (2) allowed an attorney to call another attorney " 'dense' " and a " 'hatchet attorney,' " (3) told defendants they had used six attorneys, causing delays, and he would not permit them to obtain any new attorneys,

(4) engaged in "long diatribes" concerning delays in the case but did not give extensions of time when new attorneys appeared, (5) required Penny to appear *pro se* at a hearing when her attorney's train was canceled, and (6) allowed an *ex parte* communication with opposing counsel. Defendants also repeated their allegation from their first petition that they had previously hired and fired Judge Lane's former law firm and they believed that caused Judge Lane to be biased against them. The motion was filed the day a hearing was set to hear motions in the case. Defendants included a declaration in support of the petition, but it was not notarized.

¶ 162        Another judge conducted a hearing on the motion. Defendants did not seek to provide witness testimony. The trial court noted its previous concern the first motion to substitute might have been filed for purposes of seeking a delay. The court noted the second motion was filed under similar circumstances. The court found the petition was not verified by an affidavit, was insufficient on its face, and did not have a valid basis in fact or law. The court did not specifically find the motion frivolous, but it "reminded" the parties of Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) regarding sanctions.

¶ 163        In May 2023, defendants filed a third motion to substitute Judge Lane for cause, primarily alleging Judge Lane was biased based on his affiliation with the Catholic Church. Defendants also repeated their allegation from their first motion that they had previously hired and fired Judge Lane's former law firm and they believed that caused Judge Lane to be biased against them. Defendants included an affidavit from Spolar stating that a Catholic priest had shook his head, indicating a negative reaction, during Spolar's testimony. That affidavit was not notarized. Defendants signed a verification, but it was not notarized.

¶ 164        A different judge held a hearing on the motion. Defendants presented evidence from a newspaper article stating Judge Lane's Catholic upbringing made him the person he is

today. During trial, in ruling that evidence of what the Diocese would do with money left to it, including creating a monument, was irrelevant, Judge Lane stated in passing that a monument "would be counter to what the Roman Church does because we don't have any idols outside of the Heavenly Father."

¶ 165       Judge Lane was called to testify at the hearing and stated he did not have a connection to the Catholic Church and was an atheist. Judge Lane testified he was not a practicing Catholic and had not been a practicing Catholic since before 2007. He had no affiliation with the Diocese or the Catholic Church in Abingdon. Judge Lane indicated his Catholic upbringing made him a person who told the truth, made good decisions, and did what was right. The trial court noted the matter could have been raised during trial and denied the motion.

¶ 166                    2. *Comments Potentially Heard by the Jury*

¶ 167       During the punitive damages portion of the trial, one of defendants' counsels complained he could hear the jurors in the jury room and was concerned they could hear the trial court. He expressed concern the jury room was not adequately soundproofed. However, he made no specific objection or request, other than to state he wanted the matter on the record. On multiple occasions, the court instructed the jury that, if they were to hear or observe anything about the case outside of the courtroom, they must immediately inform the court. The record does not reflect the jurors ever did so.

¶ 168                    3. *Offer to the Rifle Club*

¶ 169       Before Tonny's testimony, counsel for defendants noted a previous motion *in limine* to present evidence a proposed offer by defendants to the Rifle Club had been denied. Defendants' counsel argued the trial court wrongly interpreted the evidence to be a settlement

offer. Counsel argued the matter was not a settlement offer but was instead an offer related to Egan's suggestion defendants could agree to change the trust. Counsel also likened evidence of the issue to mitigation of damages and argued it affected any determination of punitive damages. He further argued Egan opened the door to testimony about the offer. Counsel for one of the plaintiffs noted the offer was for only five acres. The court found this was nothing more than negotiations and again denied the motion.

¶ 170                                     4. *Jury Instructions*

¶ 171          The trial court held an informal jury instruction conference off the record. At the formal conference, there was no objection to the court's instruction No. 1 concerning fraud. The record contains several versions of the instruction, with one stating plaintiffs claimed in part the trust documents were unenforceable because "[t]hey were obtained by fraudulent misrepresentation to [Stegall] that he could change the beneficiaries of the trust document." Another merely stated, "They were obtained by fraudulent misrepresentations to [Stegall]."

¶ 172          The trial court initially instructed the jury plaintiffs claimed the trust documents were invalid on the following grounds: (1) they were obtained because defendants exercised undue influence over Stegall, (2) they were signed when Stegall was temporarily incapacitated by medical conditions, (3) they were obtained by defendants placing themselves in a fiduciary relationship with Stegall and then taking advantage of the relationship, (4) they were obtained by fraudulent misrepresentations to Stegall that he could change the beneficiaries of the trust, and (5) they were the result of a mutual mistake of fact as to whether the documents could be changed at a future date.

¶ 173          The trial court instructed the jury plaintiffs could establish undue influence as follows:

- 45 -

"Plaintiffs may establish undue influence as a ground for invalidity in two ways:

First, they may introduce proof of specific conduct alleged to constitute undue influence. If you find that the plaintiffs have proved undue influence by evidence of specific conduct, and if you find it more probably true than not true that the documents signed by Frederick Stegall on July 2, 2020, were the result of specific conduct constituting undue influence, then your answer to Special Interrogatory Number 1 should be 'Yes.'

Second, plaintiffs may establish undue influence as a ground for invalidity by proving each of the following propositions:

1. That there was a relationship between the defendants and Frederick Stegall whereby the defendants exercised dominance over Stegall and Stegall was dependent on the defendants.

2. That Stegall reposed trust and confidence in the defendants.

3. That defendants caused the preparation of the documents Stegall signed on July 2, 2020.

4. That defendants received a substantial benefit under the terms of the documents when compared to others who have an equal claim to Stegall's bounty.

If you find that each of these propositions has ben [*sic*] proved by clear and convincing evidence, then your answer to Special Interrogatory Number 1 should be 'Yes.' "

The court also instructed the jury, "When I use the expression 'undue influence,' I mean

- 46 -

influence exerted at any time upon the decedent which causes him to make a disposition of his property which is not his free and voluntary act."

¶ 174      On Friday March 10, 2023, the jury retired to consider their verdict at 3:29 p.m. Shortly afterward, the trial court stated it had given a wrong court's instruction No. 1 concerning the fraudulent misrepresentation claim. The court noted it had not given the correct instruction in light of the third amended complaint. The jury was initially instructed, in part, regarding fraudulent misrepresentation that plaintiffs claimed the trust documents were unenforceable because "[t]hey were obtained by fraudulent misrepresentation to [Stegall] that he could change the beneficiaries of the trust document." Instead, they should have been told "[t]hey were obtained by fraudulent misrepresentations to [Stegall]."

¶ 175      Plaintiffs' counsel recalled "there was a whole lot of shuffling around on Court's Instruction 1" at the instruction conference and noted "the last time it was to be assembled," the instruction would be the more general version in light of the third amended complaint. Counsel did not catch the error until the instructions were read. The parties noted the special interrogatories correctly covered the matter. Those asked, "Was [Stegall] induced to sign the documents on July 2, 2020, by false representations about the documents on which he relied." Defendants generally objected, arguing a rereading was not necessary and they had given closing arguments based on the instruction given. After an off-the record discussion, the trial court also indicated defendants objected to the modification of the instruction. Over objection, the court read the correct instruction to the jury. The jury then again retired to consider its verdict at 3:49 p.m.

¶ 176                          I. Verdict

¶ 177      At 4:32 p.m. the jury returned with a verdict. The jury found the trust documents

invalid and signed special interrogatories finding the documents were signed (1) as the result of undue influence, (2) when Stegall was incapacitated by age or medical condition, (3) by false representations about the documents, (4) as the result of mutual mistake as to whether they could be modified, and (5) as the result of fraudulent, intentional, and willful and wanton conduct by defendants. The jury answered "No" to interrogatories asking whether (1) Stegall unreasonably delayed filing the lawsuit once he had reason to know he conveyed property to them, (2) the individuals who took Stegall to Blake's office of July 6, 2020, were agents of the plaintiffs who acted wrongly or fraudulently, and (3) Stegall knowingly and intentionally asked Blake to drop the lawsuit after it was filed.

¶ 178                                J. Punitive Damages

¶ 179        On Monday, March 13, 2023, the jury returned to hear evidence regarding punitive damages. Defense counsel again sought to offer evidence of the previous offer to the Rifle Club, and the trial court denied the motion. Defense counsel also told the court, having learned on Friday punitive damages were going to be heard on Monday, it sent a subpoena on Saturday to the Diocese to have a person bring documents to show the Diocese's net worth. Defendants argued the evidence was relevant because a comparison of the financial vulnerability of defendants and plaintiffs would be a consideration for the jury when determining any punitive damage award. Plaintiffs argued the Diocese's net worth was irrelevant. The court found defendants were on notice of the possibility of punitive damages a year earlier and the subpoena was not timely.

¶ 180        Plaintiffs presented evidence they incurred legal fees of at least $134,775.20 and the estate incurred additional fees of at least $93,926.84, and they anticipated more for appeal. The record also contains evidence of additional charges for expenses. Witnesses estimated the

value of Stegall's real estate as between $1.750 million and $2 million.

¶ 181　　　　　During examination of witnesses, plaintiffs elicited testimony from Chaney concerning billing for legal research regarding punitive damage claims for nominal losses. Chaney testified the relief sought by the action was not monetary damages, but setting aside the trust documents, and those were the "nominal losses" incurred by the Rifle Club, not in a monetary sense, but in an "ownership sense." Chaney testified the Rifle Club split the legal fees with the Diocese. The Rifle Club brought in about $17,000 in dues each year.

¶ 182　　　　　Defendants objected to the introduction of an exhibit of legal fees incurred by plaintiffs, arguing those fees included billings for the probate and guardianship actions instead of solely the declaratory judgment action. The trial court stated the evidence of fees was admissible for the jurors to consider the actual and potential harm of defendants' conduct.

¶ 183　　　　　Tonny testified she worked as an independent contractor in her dental practice. When asked how much money she made in the past few years, she said she did not know. She owned three parcels of property, with a mortgage on one of them, which was taken out in January 2023. That property had an appraised value of $168,435. Defendants were also beneficiaries under their parents' spendthrift trusts, which was the family farm of approximately 185 acres, and of which Tonny was the trustee. The designation as a spendthrift trust protected the trust from creditors. Tonny acknowledged plaintiffs were seeking to become creditors of defendants. Sometime in 2022, Tonny sold her interest in a possible photograph of Abraham Lincoln for $42,000. Tonny testified she financially supported Penny. She said she had worked very little because of the litigation. The record indicates Tonny paid legal fees from the trust, stating Cassidy told her she could do so. Defendants had made $88,479.61 in claims against the estate for attorney fees. Additional amounts for expenses were also charged to the estate. Tonny

stated defendants planned to appeal the case. Penny did not appear or testify.

¶ 184       At the jury instruction conference, defendants sought an instruction individuals have a right to present claims and defenses under the first amendment (U.S. Const., amend. I). Defendants stated the proposed instruction was based on an Illinois Supreme Court case but did not specifically name the case. The offered instruction form cited the case of *DeLuna v. St. Elizabeth's Hospital*, 147 Ill. 2d 57 (1992).

¶ 185       The jury instructions given stated, in part, the jury was to consider, "How reprehensible was the conduct of each defendant?" That consideration included, among other factors, the financial or other vulnerability of plaintiffs and whether the harm was physical, as opposed to economic. The instruction also told the jury to consider, "What actual and potential harm did defendant's [*sic*] conduct cause to the plaintiffs in this case?" The jury was also instructed individuals have the right under the Illinois Constitution to a jury trial in a civil case.

¶ 186       In closing arguments, defense counsel noted the reference to nominal damages and suggested, "I don't think you should award any punitive damages at all but, you know, again, there's ways if you decide to award some small amount that you could, you know, obviously—I think you should consider the—this reference to the nominal—nominal harm." Defense counsel also argued defendants should not be punished for defending their claims. The jury retired to consider their verdict at 2:31 p.m. and returned at 3:05 p.m. The jury awarded $400,000 in punitive damages against Tonny and $200,000 against Penny.

¶ 187       The trial court entered a judgment order declaring the trust documents and deed null and void and awarding plaintiffs costs. The court then entered a monetary judgment against Tonny in the amount of $400,000 and Penny in the amount of $200,000.

¶ 188                         K. Posttrial Motions

¶ 189        Defendants moved for judgment notwithstanding the verdict. The trial court

denied the motion. Defendants filed posttrial motions alleging, in part, (1) the court should have

granted judgment notwithstanding the verdict on all claims; (2) the punitive damage award was

improper because the fraud claim should have been dismissed, there was insufficient evidence

defendants acted in a wanton or malicious manner, the jury acted with passion and prejudice, the

amount was excessive, and the court erred in allowing evidence of fees from other cases; (3) the

court erred in denying motions for continuances; (4) there were various evidentiary or other

errors; (5) the court gave improper jury instructions; (6) the court erred in allowing the third

amended complaint; (7) the court erred in admitting evidence of the July 6, 2020, will; (8) the

court was biased against defendants, and there should have been a substitution of judge for

cause; (9) the jury room was not soundproof; (10) the jury heard prejudicial hearsay from

Haynes; (11) the court wrongly excluded evidence of the offer to the Rifle Club; (12) the court

did not allow the subpoena to the Diocese to be enforced; and (13) cumulative error. Neither

motion alleged punitive damages could not be awarded without a specific award of

compensatory damages.

¶ 190                    L. First Appeal and Proceedings on Remand

¶ 191        After multiple premature appeals, the trial court denied the final posttrial motion.

Defendants appealed. On appeal, we affirmed the probate action but dismissed the declaratory

judgment action based on the lack of a final order due to an outstanding motion for prejudgment

interest. *Stegall*, 2024 IL App (4th) 230159-U, ¶¶ 23, 42.

¶ 192        On remand, Penny and Tonny each filed petitions to vacate a void judgment under

section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2024)), alleging, in part, the orders in the

declaratory judgment action were void because (1) the action was filed without authorization

from Stegall's GAL, (2) Stegall's estate was never properly substituted as a party after his death, and (3) plaintiffs lacked standing.

¶ 193 Before the section 2-1401 petition was ruled on, defendants filed a fourth motion to substitute Judge Lane for cause, alleging Judge Lane (1) was biased based on his affiliation with the Catholic Church and injected his religious beliefs into the record, (2) failed to recuse himself when defendants had previously hired and fired Judge Lane's former law firm, (3) improperly threatened defendants with incarceration, (4) engaged in *ex parte* communication, (4) denied Penny a reasonable accommodation, (5) proceeded with the case without a proper substitution of the estate as a party, (6) violated the Dead Man's Act (735 ILCS 5/8-201 *et seq.* (West 2024)) by admitting testimony of a deceased witness, (7) refused to remove biased jurors, and (8) allowed improper punitive damages. An affidavit from defendants was included.

¶ 194 A different judge held a hearing. Before the hearing, Penny's counsel told the trial court she was requesting a full day for an evidentiary hearing in which she would call Judge Lane as a witness. At the hearing, the court stated it would consider documentary evidence and hear arguments but found there was no need for an evidentiary hearing in which witnesses would testify. The court stated it "reviewed and re-reviewed and re-re-re-reviewed the allegations" and found no issue that warranted an evidentiary hearing. The court noted it was the fourth motion for the substitution of Judge Lane and defendants previously had the opportunity to call witnesses and had actually previously cross-examined Judge Lane. The court listed each allegation and identified allegations that had previously been raised in earlier motions. The court stated it was not required to allow defendants to relitigate matters that had already been decided. Where arguably new matters were raised, those regarded legal rulings by Judge Lane that defendants argued were in error and were issues in the first appeal. Thus, the court reasoned

there was no need to hear witnesses on those matters. Finally, the court noted the previous motions to substitute were often filed on days when there was a hearing scheduled on multiple motions, causing delays, and suggested the same occurred with the fourth motion, which caused yet another delay in the case. Accordingly, the court denied the motion.

¶ 195        Following the denial of the motion to substitute Judge Lane for cause, Judge Lane heard and denied the section 2-1401 petitions and resolved all outstanding motions in the case with a statement that no new motions would be allowed.

¶ 196        This appeal followed.

¶ 197                              II. ANALYSIS

¶ 198        On appeal, defendants contend (1) the trial court lacked personal and subject-matter jurisdiction, (2) the court erred regarding multiple evidentiary and other rulings, (3) plaintiffs were improperly allowed to amend their pleadings after evidence was presented, (4) the court erred in denying their motion for judgment notwithstanding the verdict, (5) the punitive damage award was improper and excessive, (6) the court gave various improper jury instructions, (7) the court was biased against defendants, and a substitution of judge for cause should have been granted, (8) the court wrongly excluded evidence of a settlement offer to the Rifle Club, (9) the court erred in denying defendants' motion for a mistrial, and (10) the court erred in admitting the July 6, 2020, will into evidence.

¶ 199                              A. Jurisdiction

¶ 200        Defendants first contend the trial court lacked personal jurisdiction over plaintiffs and lacked subject-matter jurisdiction over the declaratory judgment action, causing all underlying orders to be void because (1) the declaratory judgment action was filed without authorization from Stegall's GAL, (2) Stegall's estate was never properly substituted as a party

after his death, (3) the case was filed in the wrong division of the court, (4) plaintiffs lacked standing, (5) the court improperly denied the fourth motion to substitute Judge Lane for cause without an evidentiary hearing, causing Judge Lane to rule on the section 2-1401 petition when he was not authorized to do so, and (6) the court failed to hold an evidentiary hearing on the merits of the section 2-1401 petition.

¶ 201                                    1. *Personal Jurisdiction*

¶ 202          Defendants first suggest the trial court lacked personal jurisdiction because Stegall was not authorized to consent to filing the declaratory judgment and his GAL did not authorize the filing.

¶ 203          Personal jurisdiction is a waivable right, and there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the trial court. *Solargenix Energy, LLC v. Acciona, S.A.*, 2014 IL App (1st) 123403, ¶ 33. Here, the record shows Stegall was represented by Blake, who filed the declaratory judgment for him at a time when Stegall had not been declared incompetent or disabled or had been assigned a guardian other than Egan as his GAL in the guardianship action. The trial court recognized Blake represented Stegall in the declaratory judgment action, and Egan was not authorized to represent Stegall in that action. Thus, Blake was legally authorized to file the action, and Egan as the GAL was not required to consent. Regardless, the record also shows Egan supported the action.

¶ 204          Stegall never objected to personal jurisdiction over him, nor are we able to locate any objections by defendants to the trial court's exercise of personal jurisdiction over any of the parties. To the extent defendants also argue the court lacked personal jurisdiction over the estate because of improper joinder or substitution, we again note that, by seeking to join, the estate consented to personal jurisdiction, and defendants never objected to the exercise of personal

jurisdiction over the estate.

¶ 205                                      2. *Subject-Matter Jurisdiction*

¶ 206          Defendants next argue the trial court lacked subject-matter jurisdiction because

Stegall's estate was never properly substituted as a party after his death, and they further allege

the declaratory action was mislabeled and filed in the wrong division of the court. They also

argue the court lacked subject-matter jurisdiction because plaintiffs lacked standing.

¶ 207          Under present law, "[w]ith the exception of the circuit court's power to review

administrative action, which is conferred by statute, a circuit court's subject matter jurisdiction is

conferred entirely by our state constitution." *Belleville Toyota, Inc. v. Toyota Motor Sales,*

*U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002). "Thus, in order to invoke the subject matter jurisdiction

of the circuit court, a plaintiff's case, as framed by the complaint or petition, must [merely]

present a justiciable matter." *Id.* "Even a defectively stated claim is sufficient to establish a

circuit court's subject-matter jurisdiction if the claim falls within the general class of cases that

the court has the inherent power to hear." *In re Marriage of Armstrong*, 2016 IL App (2d)

150815, ¶ 18. "Compliance with a statutory requisite presents a different matter from whether a

circuit court has subject-matter jurisdiction." *Id.* ¶ 19. A statutory requirement or prerequisite

cannot be jurisdictional, since jurisdiction is conferred on the trial courts by our state

constitution. *Belleville Toyota*, 199 Ill. 2d at 335-37.

¶ 208          There is no doubt the trial court here had the inherent power to hear and

determine declaratory judgment and estate cases. Meanwhile, the "joinder" of the executor as a

party, as opposed to its "substitution" as a party, is a statutory procedural matter. Section 2-

1008(b)(2) of the Code (735 ILCS 5/2-1008(b)(2) (West 2024)) provides, "[i]f a motion to

substitute is not filed within 90 days after the death is suggested of record, the action may be

dismissed as to the deceased party." "The language of this section uses the permissive 'may' rather than the mandatory 'shall'; therefore, the court has discretion as to whether to dismiss the action." *Senese v. Climatemp, Inc.*, 289 Ill. App. 3d 570, 583 (1997). Thus, any errors that occurred because the estate was "joined" in the action instead of "substituted" would not deprive the court of subject-matter jurisdiction. Instead, the court's handling of the matter is governed by a discretionary statutory procedure.

¶ 209 Likewise, any misnomer of Stegall as a party was purely a statutory procedural issue. Section 2-401 of the Code (735 ILCS 5/2-401 (West 2024)) provides, "Misnomer of a party is not a ground for dismissal but the name of any party may be corrected at any time, before or after judgment, on motion, upon any terms and proof that the court requires." That the captions of the pleadings at times listed Stegall as a party, as opposed to his estate, did not deprive the trial court of subject-matter jurisdiction.

¶ 210 Defendants also suggest the case was filed in the wrong division. However, in 1964, the Illinois Constitution replaced the limited jurisdiction of the probate court with the unified general jurisdiction of the trial court, granting to the trial court unlimited original jurisdiction of all justiciable matters. *In re Estate of Breault*, 63 Ill. App. 2d 246, 270 (1965). Further, when a case is filed in the wrong division, instead of dismissing it, the proper procedure is to transfer the case to the correct division. *People v. Graham*, 2025 IL App (1st) 220565-U, ¶¶ 9-11 (citing *People v. Velazquez*, 2020 IL App (1st) 181958).

¶ 211 Here, a probate action was filed in the probate division, and a declaratory action was filed in the miscellaneous remedies division. Those cases were then consolidated. Nothing seems to suggest either case actually was filed in the wrong division and, in any event, even if one was, it did not deprive the trial court of subject-matter jurisdiction.

¶ 212 Defendants also argue the trial court denied them due process by failing to hold an evidentiary hearing on the section 2-1401 petition. However, as previously discussed, defendants' arguments concerning personal and subject-matter jurisdiction were legally without merit. Contrary to defendants' arguments, those matters did not raise factual issues that could not be determined from the record or that would make any difference in the determination that any errors deprived the court of subject-matter jurisdiction over the declaratory judgment action.

¶ 213 We also note defendants contend the trial court at one point found it lacked legal authority over the proceedings, but our review of the record reveals the court was referring to its lack of ability to assign a temporary guardian in the guardianship proceeding before hearing evidence from a physician and the lack of an appearance by Blake in the guardianship action. That matter and the comments by the court had nothing to do with the court's subject-matter jurisdiction in the declaratory judgment action, in which Blake already represented Stegall. In any event, to the extent defendants argue a lack of an appearance by Blake in the guardianship proceeding deprived the court of jurisdiction in the declaratory judgment action, or in any of the actions, the argument lacks merit. The entry of appearance of an attorney is governed by supreme court rules, and "an attorney's failure to file an appearance does not divest the circuit court of subject matter jurisdiction." *In re Estate of Mivelaz*, 2021 IL App (1st) 200494, ¶ 65.

¶ 214 Finally, as to standing, the Illinois Supreme Court has made clear a challenge to standing in a civil case is an affirmative defense. *U.S. Bank, N.A. v. Kosterman*, 2015 IL App (1st) 133627, ¶ 10 (citing *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 508 (1988)). A lack of standing argument in a civil case is forfeited if not raised in a timely fashion in the trial court. *Thomas v. County of Peoria*, 2023 IL App (4th) 221075, ¶ 17. This is not a matter of subject-matter jurisdiction. See *Nationstar Mortgage, LLC, v. Canale*, 2014 IL App (2d)

130676, ¶ 15 ("[T]hough standing might be 'an element of justiciability,' it is not a requirement for a 'justiciable matter.' ").

¶ 215    We note defendants raised the above issues only as a matter of subject-matter jurisdiction. They do not argue (1) the trial court erred in failing to dismiss or take other action based on improper joinder, (2) error in the division the cases were filed in, (3) error in the captioning of the cases, (4) any failure of Blake to enter an appearance in the guardianship action, or (5) a lack of standing. Accordingly, we do not address whether there were any errors in those regards.

¶ 216                    3. *Fourth Motion to Substitute Judge for Cause*

¶ 217    Defendants next contend the trial court lacked jurisdiction to rule on the section 2-1401 petitions. They argue the court improperly denied the fourth motion to substitute Judge Lane for cause because it did not hold an evidentiary hearing, causing Judge Lane to rule on the section 2-1401 petitions when he was not authorized to do so.

¶ 218    Section 2-1001(a)(3)(iii) of the Code (735 ILCS 5/2-1001(a)(3)(iii) (West 2024)) provides that, upon a motion for substitution of a judge for cause, "a hearing to determine whether the cause exists shall be conducted as soon as possible by a judge other than the judge named in the petition." Nearly the same language also appears in the statutory provision applicable to substitution of judges under the Code of Criminal Procedure of 1963. See 725 ILCS 5/114-5 (West 2024). In the criminal context, it has been held the right to a substitution of judge for cause is not absolute. After a hearing, a court's ruling on such a motion, even if erroneous, is not a jurisdictional defect that rendered subsequent proceedings void. *People v. Robinson*, 18 Ill. App. 3d 804, 807 (1974). It also has been held a defendant was afforded a "hearing" within the meaning of section 114-5 when given the opportunity to orally argue the matter before the trial

court. *People v. Polk*, 55 Ill. 2d 327, 335-36 (1973); *People v. Spurlark*, 67 Ill. App. 3d 186, 201 (1978); *People v. Winchell*, 45 Ill. App. 3d 752, 757 (1977). Under circumstances in which a defendant attempts to delay proceedings, a hearing allowing only argument on a motion to substitute judge is also sufficient. See *Polk*, 55 Ill. 2d at 336. We find the reasoning of those cases equally applicable to section 2-1001.

¶ 219　　　　Here, the trial court did not err in denying the fourth motion for a substitution of judge without holding an evidentiary hearing that included witness testimony. The court specifically allowed documentary evidence and argument. The court stated it "reviewed and re-reviewed and re-re-re-reviewed the allegations" and found no issue that warranted an evidentiary hearing. As the court noted, this was the fourth motion for substitution of Judge Lane, and defendants previously had the opportunity to call witnesses and had actually cross-examined Judge Lane. Any allegations requiring evidence had previously been raised in earlier motions, and hearings had been held. We agree the court was not required to allow defendants to relitigate matters that had already been decided.

¶ 220　　　　Where arguably new matters were raised in the fourth motion, the trial court correctly determined those regarded legal or evidentiary rulings by Judge Lane that defendants argued were in error and either had been raised as issues in the first appeal or could have been raised. There was no need to hear witnesses on those matters.

¶ 221　　　　Further, the trial court noted the motions to substitute were often filed on days when there was a hearing scheduled on multiple motions, causing delays, and suggested the same occurred with the fourth motion, which caused yet another delay in the case. While the court did not specifically find the matter was presented for purposes of delay, we observe it had the appearance of being filed for such a purpose. Under these circumstances, the court's denial of the

motion to substitute Judge Lane without hearing testimony from witnesses was appropriate. Accordingly, Judge Lane had jurisdiction to dismiss the section 2-1401 petitions.

¶ 222 Having concluded the trial court had personal and subject-matter jurisdiction. we now address the remainder of the appeal.

¶ 223 B. Forfeited Issues

¶ 224 At the outset, we note a number of issues have been forfeited on appeal. In particular, defendants contend the trial court erred with respect to multiple evidentiary and other matters. In many cases, defendants provide a conclusory statement the court erred, with no meaningful citation to authority. When authority is cited, it is done so generally, with no meaningful explanation as to how the authority provided is applicable.

¶ 225 Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant's brief to contain an "[a]rgument" section, "which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." "A contention that is supported by some argument but no authority does not meet the requirements of Rule 341 and is considered forfeited." *Crull v. Sriratana*, 388 Ill. App. 3d 1036, 1045 (2009). Further, "[c]itations to authority that set forth only general propositions of law and do not address the issues presented do not constitute relevant authority for purposes of Rule 341(h)(7)." *Robinson v. Point One Toyota, Evanston*, 2012 IL App (1st) 111889, ¶ 54.

¶ 226 Based on the above, we do not address defendants' arguments the trial court erred by (1) finding irrelevant evidence of what the Diocese did or planned to do with money paid to it from Stegall's certificates of deposit or the land from the trust, (2) failing to instruct the jury that an alleged mistake could not be one of law, and (3) allowing evidence from Stegall's deposition. Regarding Stegall's deposition, we note counsel did include a citation to a statute,

but it was an irrelevant criminal procedure statute, and no meaningful legal analysis was provided.

¶ 227　　　　Defendants also suggest or hint at other claims of error in their briefs but do not clearly assign or argue them as error. In addition, some issues hinted at or raised in the first appeal have not been raised in the second. Therefore, we do not address issues pertaining to (1) the soundproofing of the jury room, (2) the comments possibly overheard by the jury, (3) the limits on the time for discovery, (4) the issues concerning jury selection, (5) the exclusion of photographs taken by defendants, (6) the severance of the cases, (7) the use of boards labeling defendants as "CON-ARTISTS," (8) allowing evidence from Cassidy's deposition, (9) allowing testimony from Miller in alleged violation of the attorney-client privilege, (10) the alleged violation of the Dead Man's Act, (11) the standing of the Diocese and the Rifle Club to file suit, and (12) the arguments concerning effective assistance of counsel.

¶ 228　　　　In addition, as we discuss further later in this disposition, defendants argue the denial of requests for continuances were prejudicial. While that argument is set forth with a separate subheading in their brief, defendants appear to address it primarily as additional evidence of the trial court's bias in connection with their multiple motions to substitute Judge Lane for cause. To the extent defendants are also separately arguing the court erred in denying continuances, we find the issue forfeited because they do so with no citation to authority regarding the law of when the denial of a continuance is proper.

¶ 229　　　　　　　　　　　C. Amendment of Pleadings

¶ 230　　　　Defendants contend the trial court erred in allowing plaintiffs to file a third amended complaint after the evidence was presented. Defendants argue the amendment expanded the fraudulent misrepresentation claim to add allegations that surprised and

prejudiced defendants, leaving them unable to perform additional discovery and defend against the new allegations.

¶ 231    Under section 2-616(c) of the Code (735 ILCS 5/2-616(c) (West 2022)), "[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." The test is "whether the allowance of the amendment furthers the ends of justice." *American National Bank & Trust Co. of Chicago v. Dozoryst*, 256 Ill. App. 3d 674, 678 (1993). This includes whether the amendments altered the nature of proof required to defend and whether the other party would be prejudiced or surprised. *Id.* at 679; see *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992) (listing factors to consider).

¶ 232    Section 2-616(c) is to be liberally construed so that cases are decided on their merits and not on procedural technicalities. *Pry v. Alton & Southern Ry. Co.*, 233 Ill. App. 3d 197, 213 (1992). Any doubt as to whether pleadings should be amended should be resolved in favor of an amendment. *Id.* The standard of review is for an abuse of discretion. *Dozoryst*, 256 Ill. App. 3d at 678. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 233    Here, the trial court did not abuse its discretion in allowing the amendment. Because the motion to amend the pleadings could be made any time before judgment, it was timely. Further, defendants were not prejudiced or surprised by plaintiffs' fraudulent misrepresentation claim. The second amended complaint alleged recission, accounting, and fraud as causes of actions based on (1) undue influence over Stegall by defendants, (2) the temporary incapacity of Stegall, (3) presumptive fraud based on defendants' fiduciary

relationship with Stegall, (4) fraudulent misrepresentation as to the effect of the irrevocable trust, and (5) mutual mistake of fact regarding the designation of the trust as irrevocable. The third amended complaint alleged the same causes of action but expanded the fraudulent misrepresentation to include additional factual allegations of various misrepresentations and included allegations of concealment of facts that induced Stegall to sign the trust documents.

¶ 234   Early in the case, at the discovery stage of proceedings, one of plaintiffs' counsels stated he would like to conform the complaint as nearly as possible to the facts as they developed. Plaintiffs did so once before trial by filing a second amended complaint. Then, although the trial court did not decide the motion until later, plaintiffs again stated their intent to further amend the pleadings at the end of their case, before defendants presented evidence. Thus, defendants were aware throughout the proceedings they were facing allegations of fraudulent misrepresentation and knew the pleadings were likely to be amended. Defendants were also facing allegations of undue influence, which also alleged similar false or misleading representations and concealment of facts. Under such circumstances, defendants would not be prejudiced or surprised if the pleadings were amended as additional facts came to light supporting the fraud claim, including allegations they concealed various facts from Stegall to induce him to sign the trust documents.

¶ 235   Defendants cite *Koplin v. Hinsdale Hospital*, 207 Ill. App. 3d 219 (1990), to argue otherwise. However, that case found an abuse of discretion in allowing an amendment that added five new counts to a one-count complaint. *Id.* at 236-37. Here, with the exception of adding allegations of fraudulent concealment that were highly related to already existing allegations, the causes of action remained the same, making *Koplin* clearly distinguishable. We also note, while fraudulent concealment can be a separate cause of action (see, *e.g.*, *Bauer v.*

*Giannis*, 359 Ill. App. 3d 897, 902-03 (2005)), the factual allegations of concealment here provided circumstantial evidence of fraudulent misrepresentation by showing the intent of defendants to deceive or affirmatively misrepresent facts to Stegall and the attorneys involved so as to induce Stegall to sign the documents. Thus, an entirely new cause of action was not being added to the complaint. Remaining mindful any doubt as to whether pleadings should be amended should be resolved in favor of amendment, we determine the trial court did not abuse its discretion when it allowed plaintiffs' motion to conform the pleadings to the proof at trial.

¶ 236        Defendants also contend the giving of associated jury instructions on the new allegations was in error because it exacerbated any error. Having found no error in allowing the amendment, we also find no error in instructing the jury based on the allegations of the third amended complaint.

¶ 237        We further note, as we discuss next, aside from fraudulent misrepresentation, defendants were not entitled to a judgment notwithstanding the verdict on the issue of undue influence, which would separately support the judgment and award of punitive damages. Thus, even if error could be found in the amendment of the pleadings, it would be harmless because the judgment and damage award would still independently stand under that verdict.

¶ 238            D. Denial of Motion for Judgment Notwithstanding the Verdict

¶ 239        Defendants next contend the trial court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict.

¶ 240        Motions for directed verdicts and motions for a judgment notwithstanding the verdict, although made at different times, raise the same questions and are governed by the same rules of law. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 n.1 (1992) (citing *Butler v. O'Brien*, 8 Ill. 2d 203, 209 (1956)). Accordingly, we address the matter in terms of a judgment

notwithstanding the verdict, which is how defendants present the issue in their briefs.

¶ 241    We also note defendants, without providing specific legal citations or argument, additionally state they are entitled to a new trial because the verdict was against the manifest weight of the evidence. On a motion for a new trial, a court will weigh the evidence and set aside the verdict and order a new trial only if the verdict is contrary to the manifest weight of the evidence. *Id.* at 454. A verdict is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or the findings of the jury are unreasonable, arbitrary, or not based upon any of the evidence. *Id.*

¶ 242    Generally, a judgment notwithstanding the verdict is properly entered in limited cases where all of the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the moving party that no contrary verdict based on that evidence could ever stand." *Id.* at 453; *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We review a trial court's denial of a motion for a judgment notwithstanding the verdict *de novo*. *Ford v. Grizzle*, 398 Ill. App. 3d 639, 650 (2010). However, in determining the propriety of a judgment notwithstanding the verdict, a reviewing court "does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Maple*, 151 Ill. 2d at 453. The standard for obtaining a judgment notwithstanding the verdict is " 'a very difficult' " one to meet, limited to " 'extreme situations only.' " *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125 (2000) (quoting *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714 (1994)). No court has the right to enter such an award "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the

witnesses or the determination regarding conflicting evidence is decisive to the outcome."
*Maple*, 151 Ill. 2d at 454.

¶ 243                                    1.*Undue Influence and Presumptive Fraud*

¶ 244          Defendants claim plaintiffs failed to sufficiently establish undue influence. We note plaintiffs alleged both undue influence and presumptive fraud based on a fiduciary duty. The record indicates the parties and the trial court addressed the presumptive fraud claim as one of claiming a presumption of undue influence based on the existence of a fiduciary duty. Defendants argue there was no fiduciary duty proven at the time the documents were drafted because Tonny's financial power of attorney did not take effect until Stegall was found to be disabled and Penny had only a healthcare power of attorney. They also argue other means of showing undue influence were not sufficiently proven.

¶ 245          Courts distinguish undue influence arising from coercion or active fraud from undue influence resulting from the abuse of a fiduciary relationship between the parties. *In re Estate of Coffman*, 2023 IL 128867, ¶ 47. Undue influence which will invalidate a will or testamentary document is any improper urgency of persuasion whereby the will of a person is overpowered, and he or she is induced to do or forbear an act which he or she would not do or would do if left to act freely. *In re Estate of Hoover*, 155 Ill. 2d 402, 411 (1993). To constitute undue influence, the influence must be of such a nature as to destroy the testator's freedom concerning the disposition of his or her estate and render his or her will that of another. *Id.*

¶ 246          "What constitutes undue influence cannot be defined by fixed words and will depend upon the circumstances of each case." *Id.* "The exercise of undue influence may be inferred in cases where the power of another has been so exercised upon the mind of the testator as to have induced him to make a devise or confer a benefit contrary to his deliberate judgment

- 66 -

and reason." *Id.* "Proof of undue influence may be wholly inferential and circumstantial." *Id.* at 411-12. "The influence may be that of a beneficiary or that of a third person which will be imputed to the beneficiary." *Id.* at 412. False or misleading representations concerning the character of another may be so connected with the execution of the testamentary document that the allegation that such misrepresentations were made to the testator may present triable fact questions on the issue of undue influence. *Id.*

¶ 247    A presumption of undue influence may also arise based on a fiduciary duty. Such a presumption rises when (1) a fiduciary relationship exists between the testator and a person who receives a substantial benefit from the will or testamentary document, (2) the testator is the dependent and the beneficiary the dominant party, (3) the testator reposes trust and confidence in the beneficiary, and (4) the will or document is prepared by or its preparation procured by such beneficiary. See *Coffman*, 2023 IL 128867, ¶ 47.

¶ 248    This court has stated a fiduciary relationship may either be presumed from the relationship of the parties, such as from an attorney-client relationship, or "may be found to exist by the facts of a particular situation, such as a relationship where trust is reposed on one side and there is resulting superiority and influence on the other side." *Hensler v. Busey Bank*, 231 Ill. App. 3d 920, 928 (1992).

> "A fiduciary relationship exists when there is a special confidence reposed in one, who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one reposing the confidence. The factors to be considered in determining whether a fiduciary relationship exists include the degree of kinship, disparity of age, health and mental condition, and the extent to which the allegedly servient party entrusted the handling of his business and

financial affairs to and reposed faith and confidence in the dominant party." *Id.* at 927.

Thus, the presumption of undue influence "may be the result of a more informal relationship—moral, social, domestic, or even personal." *Coffman*, 2023 IL 128867, ¶ 89.

¶ 249     We first note defendants suggest plaintiffs presented a claim of undue influence based only on a fiduciary duty or conceded via jury instructions they were only presenting a claim based on a fiduciary duty. We disagree. Plaintiffs alleged both forms of undue influence, and the jury was instructed on both.

¶ 250     Plaintiffs provided evidence defendants spent significant amounts of time with Stegall shortly before the trust documents were drafted and engaged in conversations with him about Haynes. By their own testimony, Stegall placed his trust in defendants. Defendants contended Stegall, a person who they also alleged was in need of assistance, asked them to help him. They then drove Stegall to multiple attorneys and told those attorneys of Stegall's purported wishes. During that time, the evidence provided the inference defendants were in control of where Stegall went and who he saw.

¶ 251     There was evidence that, when an attorney could not quickly provide a trust, defendants moved on to another attorney without disclosing their previous consultations. Plaintiffs further provided evidence that, during consultations, defendants lied about Haynes to the attorneys involved and in front of Stegall. That, too, provided circumstantial evidence they lied to Stegall about Haynes. At some consultations, one of the defendants did most of the talking. Defendants also sought to keep Stegall away from others by seeking to obtain an order of protection against Haynes. After the trust documents were executed, defendants did not produce them until 2021, and once they did so, there was evidence they again inserted

themselves into Stegall's life, taking control over many aspects of his life, including installing cameras in his home and telling him false information, such as the Rifle Club was suing him. While those facts occurred after the trust documents were executed, they are evidence of defendants' previous intent to control Stegall or give him false information. Meanwhile, there was also evidence Stegall was easily confused and would be easy to influence, especially in regard to signing documents. Thus, there was evidence of traditional undue influence based on fraud or coercion, along with evidence of presumptive undue influence based on a moral, social, domestic, or personal fiduciary duty.

¶ 252      While defendants presented their own evidence to contradict that of plaintiffs, it was for the jury, who heard and saw the witnesses, to determine which version was credible. Thus, the evidence, when viewed in the light most favorable to plaintiffs, does not so overwhelmingly favor defendants such that no contrary verdict based on that evidence could ever stand. For the same reasons we discussed above, we also find the verdict was not against the manifest weight of the evidence.

¶ 253      Because we find the verdict was sufficiently proven on the issue of undue influence, we need not discuss the remaining alleged bases of recovery, since that finding was sufficient to invalidate the trust documents. Claims of undue influence in an estate case may also support an award of punitive damages. See *In re Estate of Hoellen*, 367 Ill. App. 3d 240, 249-51 (2006). "Where several causes of action are charged and a general verdict is returned, such will be sustained if there are one or more good counts or causes of action to support it." *Wolford Morris Sales, Inc. v. Weiner*, 75 Ill. App. 2d 238, 247 (1966). Nevertheless, we also address defendants' argument on the fraud claim, as it too supports an award of punitive damages. We need not, and do not, discuss the remaining alternate bases for invalidation of the

trust documents, as those did not involve conduct of defendants that would support a punitive damage award. Likewise, because we do not discuss those matters, we also do not discuss other arguments related to mutual mistake or Stegall's mental capacity.

¶ 254                                    2. *Fraudulent Misrepresentation*

¶ 255        Defendants contend there was a lack of evidence they made any fraudulent misrepresentations to Stegall. They argue the sole issue in the second amended complaint was defendants or Holland made fraudulent misrepresentations of fact as to the effect of the irrevocable trust and whether Stegall could later change the trust beneficiaries. Defendants further argue plaintiffs failed to prove they made any false representations to Stegall.

¶ 256        The elements of a cause of a common-law action for fraud are: (1) a false statement of material fact, (2) knowledge or belief by the defendant the statement is false or his awareness he is ignorant of its truth, (3) intent by the defendant to induce the other party to act, (4) reliance by the plaintiff on the misrepresentation, and (5)injury caused by the reliance. *Wright v. Richards*, 144 Ill. App. 3d 450, 457 (1986). "In addition to misrepresentation, fraud may also consist of the omission or concealment of a material fact when such an act is done with the intent to deceive under circumstances creating an opportunity and duty to speak." *Id.* "[F]or fraud to be sufficient to vitiate a contract, it ordinarily must involve a misrepresentation of a material fact which induces the party defrauded to act." *Mt. Zion State Bank & Trust v. Weaver*, 226 Ill. App. 3d 783, 787 (1992). "When the fraud involves the execution of an instrument, the misrepresentations must be such as to induce the party allegedly defrauded to execute an instrument which he did not intend to execute." *Id.* The intent to deceive may be proved by circumstantial evidence. *Wright*, 144 Ill. App. 3d at 457. "However, fraud must be proved by clear and convincing evidence." *Id.*

¶ 257　　　　　　Here, defendants focus almost solely on the allegation in the second amended complaint limiting the allegations of fraud to an alleged misrepresentation about Stegall's ability to change the beneficiaries to the trust. However, as previously discussed, the trial court properly allowed those allegations to be expanded in the third amended complaint. As with the facts supporting the undue influence claim, there was evidence suggesting defendants misrepresented facts about Haynes to attorneys they visited while in Stegall's presence. They then took Stegall to multiple attorneys over a short period of time, generally concealing from each the visits to the others, which ultimately led to Stegall signing a document that did not conform to his previously stated wishes and he later said he did not want. Thus, aside from issues regarding whether the trust could be altered, there was evidence of other misrepresentations that induced Stegall to sign the trust documents.

¶ 258　　　　　　Defendants also suggest fraud could not be proven because there were legal means of amending the trust, such that no actual misrepresentations were actually made about it. Similarly, they argue the jury's determination of fraud was inconsistent with its determination there was also a mutual mistake between Stegall and Holland as to whether the trust could be amended. We disagree. As previously discussed, the jury could have found defendants made fraudulent misrepresentations inducing Stegall to sign the trust documents aside from any alleged mutual mistake based on Holland's representations to Stegall about the trust.

¶ 259　　　　　　Defendants further suggest the concealment allegations in the third amended complaint added an entirely new cause of action for fraudulent concealment that was not completely proven. But, as previously discussed regarding the amendment of the complaint, the concealment of facts was circumstantial evidence of defendants' intent to deceive, which supported the inference they made fraudulent misrepresentations. See generally *Miller v.*

*William Cheverolet/GEO Inc.*, 326 Ill. App. 3d 642, 658-59 (2001) (stating the corollary that fraudulent misrepresentations provided strong circumstantial evidence of intent of concealment). Accordingly, as with our determination concerning undue influence, we conclude the evidence, when viewed in the light most favorable to plaintiffs, does not so overwhelmingly favor defendants that no contrary verdict based on that evidence could ever stand. Thus, defendants were not entitled to a judgment notwithstanding the verdict, and the verdict was not against the manifest weight of the evidence, which would have entitled them to a new trial.

¶ 260                                      E. Punitive Damages

¶ 261          Defendants next contend the punitive damages award was improper. Specifically, they argue (1) a punitive damage award was not supported by the causes of action asserted or by evidence, (2) punitive damages cannot be awarded absent actual compensatory damages, (3) the costs of prosecuting the suit should not have been considered, (4) the amount of the award was excessive, (5) the trial court made evidentiary errors regarding punitive damages, and (6) the court wrongly instructed the jury on punitive damages.

¶ 262          Multiple standards apply to our review of a punitive damage award. We review *de novo* the question of whether punitive damages are available in a particular cause of action. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1138 (2004). "The trial court submits the issue of punitive damages to the jury when it determines that, as a matter of law, the evidence will support an award of punitive damages." *Id.* Once it has been determined that punitive damages are legally appropriate, a trial court's decision to submit the question to a jury will not be reversed absent an abuse of discretion. *Id.* A jury's factual determination that a defendant acted willfully or maliciously will be reversed only if it was against the manifest weight of the evidence. *Id.* However, we review a claim that a punitive damage award is

unconstitutional *de novo*. See *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 467-69 (2006).

¶ 263                                   1. *Propriety of the Award*

¶ 264       Defendants first contend the trial court should not have submitted the punitive damages claim to the jury and the evidence did not support the claim.

¶ 265       Claims of undue influence and fraud in an estate case may support an award of punitive damages. See *Hoellen*, 367 Ill. App. 3d at 249-51. An award of punitive damages is appropriate where the underlying wrongdoing is accompanied by aggravating circumstances, such as wantonness, willfulness, malice, fraud, or oppression, or when the defendant acts with such gross negligence as to indicate a wanton disregard for the rights of others. *Id.* at 253. Punitive damages are also appropriate to punish and deter conduct where a defendant is found to have committed an intentional breach of fiduciary duty. *Caparos v. Morton*, 364 Ill. App. 3d 159, 178 (2006). " 'The objectives of an award of punitive damages are the same as those which motivate the criminal law—punishment and deterrence.' " *Hoellen*, 367 Ill. App. 3d at 253 (quoting *Mattyasovszky v. West Towns Bus Co.*, 61 Ill. 2d 31, 35 (1975)). Thus, punitive damages are not awarded as compensation, but they instead serve to punish the offender and deter him or her and others from committing similar acts of wrongdoing in the future. *Id.*

¶ 266       In determining whether punitive damages are appropriate, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff the defendant caused or intended to cause, and the wealth of the defendant. *Gearhart v. Gearhart*, 2020 IL App (1st) 190042, ¶ 151. "However, because they are penal in nature, punitive damages are not favored under the law, and courts must take caution to ensure that they are not improperly or unwisely awarded." *Id.*

¶ 267 Here, defendants suggest they were being punished merely for seeking a jury trial or for pursuing their positions in seeking to protect the estate. But the jury specially found defendants' conduct was fraudulent, intentional, willful, and wanton. As previously discussed, there was evidence allowing the jury to find defendants exercised control of Stegall, took him to multiple attorneys over the course of days, to the point where he was dehydrated and confused, misrepresented facts, and then hid the trust documents that were signed. Then, in January 2021, after defendants filed the trust documents, there was evidence they again exercised control of Stegall while defending the lawsuit, including installing cameras in private areas of his home and misrepresenting the facts of the lawsuit to him. Meanwhile, plaintiffs were deprived of property they were entitled to for a significant period of time and forced to prosecute their lawsuit in order to obtain the property. Accordingly, it was proper to submit the issue of punitive damages to the jury, and the jury's determination such an award was appropriate was not against the manifest weight of the evidence.

¶ 268 2. *Award of Punitive Damages Without Compensatory Damages*

¶ 269 With merely a conclusory sentence and a single legal citation, defendants next argue an award of punitive damages is improper in the absence of actual compensatory damages.

¶ 270 Defendants have forfeited this issue. Aside from failing to provide any meaningful argument on appeal of the matter, it is well established, to preserve any alleged error for appeal, a party must object specifically both at trial and in a posttrial motion. *Snowstar Corp. v. A&A Air Conditioning & Refrigeration Service, Inc.*, 2024 IL App (4th) 230757, ¶ 83. From our review of the record, we are unable to find an objection to the punitive damage award based on the lack of a finding of actual compensatory damages, nor did defendants seek to separate the judgment into determinations of compensatory and punitive damages. Defendants then did not

include the argument in their posttrial motions. Defendants also do not meaningfully argue the issue on appeal. Thus, they have forfeited the issue.

¶ 271　　　　We do not find forfeiture lightly. We are aware that defendants attacked the award of punitive damages in other ways, and while parties must preserve an issue for appellate review, we do not limit them to the same arguments that were made below. *Brunton v. Kruger*, 2015 IL 117663, ¶ 76. However, the issue here is conspicuous on the face of plaintiffs' complaint, as it explicitly sought only declaratory relief and punitive damages. "The purpose of the pleadings is to frame the issue or issues for the court and set forth the relief the court is empowered to order." *Zygmuntowicz v. Pepper Construction Co.*, 306 Ill. App. 3d 182, 184 (1999). Defendants could have raised this issue on the pleadings, at the jury instruction conference, and in their posttrial motion; they failed to raise it at any one of these points in the case.

¶ 272　　　　This is not an academic point because the deficiency asserted here might well have been curable had it been raised in the trial court. If the court had agreed with defendants that punitive damages could not accompany purely declaratory relief, presumably, the punitive damage request would have been stricken from plaintiffs' complaint. Plaintiffs might have responded by abandoning the punitive damage request, or they might have repleaded their claims (*e.g.*, a claim for fraud seeking compensatory damages as well as declaratory relief). By waiting until their appeal to raise the issue, defendants would pull the rug out from under plaintiffs' claims only after they have lost the opportunity to correct the deficiency. This is a situation in which imposing the rules of forfeiture on defendants is entirely appropriate.

¶ 273　　　　　　　　　3. *Consideration of Attorney Fees*

¶ 274　　　　Defendants next suggest the trial court improperly allowed evidence of attorney fees, arguing it was improper to allow the jury to consider fees when determining the amount of

punitive damages. We disagree.

¶ 275        The amount of attorney fees expended in a case may be considered when assessing the propriety of a punitive damage award. *Lowe Excavating*, 225 Ill. 2d at 490. "A wealthy defendant can mount an extremely aggressive defense, and the prospect of costly litigation can deter lawyers from representing plaintiffs in such cases." *Blount v. Stroud*, 395 Ill. App. 3d 8, 27 (2009). Thus, the economic cost of the litigation is a relevant consideration. See *id*.

¶ 276        Here, it was appropriate for the jury to consider the economic costs of the litigation, especially when the record indicates defendants engaged in behavior that drew out the length of the litigation, thus increasing plaintiffs' expenses. We also find no error in the admission of a billing statement that contained references to billing in the probate and guardianship cases. The cases were directly related to one another, with the declaratory judgment and probate actions joined at times. Most notably, the cases would not have come into existence absent defendants' actions in wrongly procuring the trust documents. Thus, consideration of fees from the other cases was reasonable.

¶ 277        Defendants cite a case involving the imposition of attorney fees that did not involve punitive damages to argue to the contrary. See *Mercado v. Calumet Federal Savings & Loan Ass'n*, 196 Ill. App. 3d 483 (1990). That case is irrelevant to the consideration of fees as an indicator of economic loss as it pertains to punitive damages.

¶ 278        Defendants also suggest the jury instructions limited the award to fees pertaining only to the declaratory judgment action, stating "the jury instruction given on punitive damages limited the harm alleged to 'for just this 21 MR case.' " But that instruction actually provided the jury should consider, among multiple other factors, some of which were economic or

financial, "What actual and potential harm did defendant's [*sic*] conduct cause to the plaintiffs in this case?" It did not specifically list the declaratory judgment action. We do not read such a general and fleeting reference to "this case" in a larger jury instruction as limiting the jury to a consideration of fees pertaining only to the declaratory judgment action. Further, it is clear from the record the trial court did not intend to impose any such limitation.

¶ 279                                                    4. *Amount of the Award*

¶ 280          Defendants next argue the punitive damage award was excessive as the result of passion or prejudice or was unconstitutionally excessive, in violation of their due process rights.

¶ 281                                                    a. Passion and Prejudice

¶ 282          There are two distinct standards for evaluating a claim of an excessive punitive damage award: (1) the Illinois common law standard and (2) the federal due process standard. *Doe v. Fritch*, 2024 IL App (4th) 230585, ¶ 54 (citing *Doe v. Parrillo*, 2021 IL 126577, ¶ 38); see *Blount*, 395 Ill. App. 3d at 22. "Under common law, the trier of fact must 'decide based on the evidence presented whether the defendant's conduct was sufficiently willful or wanton to warrant the imposition of punitive damages.' " *Fritch*, 2024 IL App (4th) 230585, ¶ 54 (quoting *Blount*, 395 Ill. App. 3d at 22). "In reviewing a punitive damages award, 'relevant circumstances to consider include, but are not limited to, the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant.' " *Id.* (quoting *Blount*, 395 Ill. App. 3d at 22, citing *Deal v. Byford,* 127 Ill. 2d 192, 204 (1989)). "Those circumstances are not, however, exhaustive. It is vital that each case be carefully assessed in light of the specific facts involved, and the ultimate determination should be governed by the circumstances of each particular case." *Deal*, 127 Ill. 2d at 204. "Moreover, the underlying purposes of an award of punitive damages must be satisfied." *Id.* "The amount of a punitive

damages award will not be reversed unless it is so excessive that it must have been a result of passion, partiality, or corruption." *Blount*, 395 Ill. App. 3d at 22. "Because a jury's determination of the amount of punitive damages is a predominately factual issue, we will not reverse a jury's determination as to the amount of punitive damages unless it is against the manifest weight of the evidence." *Id.*

¶ 283　　　　Here, defendants argue several factors concerning the amount of the award apply. For example, they argue the award was disproportionate to their net worth and suggest plaintiffs failed to offer sufficient evidence of defendants' finances. They also argue the award was disproportionate to the net worth of plaintiffs, particularly the Diocese. Penny in particular portrays herself as a "pauper" and the Diocese as the "aggressor" in the litigation.

¶ 284　　　　Our supreme court has made clear "[e]vidence regarding the financial status of a defendant is simply one relevant consideration to be weighed by the judge or jury in determining an appropriate award of punitive damages." *Deal*, 127 Ill. 2d at 204-05. The plaintiff is not required to present such evidence. *Id.* at 205. Plaintiffs elicited testimony Tonny owned multiple pieces of property and defendants were the beneficiaries of a trust. Meanwhile, Tonny did not answer questions about her income, stating she did not know how much she earned as a dentist. Penny, despite arguing in her brief she is a "pauper," did not provide testimony at all. While there was evidence Tonny supported her, little more was known about her income or assets. Defendants had the opportunity to present evidence and cannot now complain of its absence. See *id.*

¶ 285　　　　Meanwhile, other considerations were appropriate in addition to defendants' net worth. As previously discussed, the economic loss to plaintiffs caused by the necessity to bring the lawsuits was appropriately considered. Significant fees were generated in the litigation, with

some of those fees charged to the estate. While defendants argue they had a duty as trustees to litigate and suggest the Diocese was the "aggressor" in the litigation, such an argument ignores the fact defendants were ultimately found liable for fraud and undue influence. We also disagree the record shows the Diocese was the "aggressor" in the litigation. Instead, the record contains evidence defendants delayed and protracted the proceedings, and defendants also charged at least some of their legal fees to the estate. Further, defendants testified they planned to appeal, which would cause plaintiffs to incur additional fees. The value of Stegall's estate, which the plaintiffs were denied the use of, was also relevant. That value was estimated at a minimum to be $1.75 million. Finally, the Rifle Club presented evidence of its limited income in comparison to the amount of fees generated.

¶ 286    We also are not in a position to reassess the credibility of the witnesses who testified at trial. Given the evidence presented, especially considering the amount of attorney fees accrued, we do not find the punitive damage awards unreasonable. Further, the awards serve both functions of punitive damages by punishing defendants for their conduct and by deterring them, and others, from similar conduct in the future. See *id.* at 205.

¶ 287    Defendants also argue the award was based on passion or prejudice based on the short lengths of time it took the jury to find liability and calculate the award. We disagree. The jury could have reasonably looked at the evidence and considered the testimony in a short period of time. We will not second guess the jury's decision merely because it reached it quickly.

¶ 288                              b. Due Process

¶ 289    Defendants also challenge the constitutionality of the trial court's punitive damages award, arguing it violated due process.

¶ 290 "A punitive damages award may be unconstitutional, in violation of the due process clause of the fourteenth amendment (U.S. Const., amend. XIV), if it is 'grossly excessive.' " *Fritch*, 2024 IL App (4th) 230585, ¶ 58. Relevant guideposts for such an inquiry include (1) the degree of reprehensibility of the conduct, (2) the disparity between the harm or potential harm suffered and the amount of punitive damages, and (3) the differences between the punitive damages and the civil penalties authorized or imposed in comparable cases. *Id.* Ultimately, whether a punitive damage award was unconstitutionally excessive is subject to *de novo* review. *Lowe Excavating Co.*, 225 Ill. 2d at 469.

¶ 291 For the same reasons we addressed when determining the jury's award was not against the manifest weight of the evidence, in our *de novo* review, we conclude the punitive damage award did not violate due process.

¶ 292                                *5. Evidentiary Arguments*

¶ 293 Defendants next contend the trial court erred by "effectively quashing the subpoena" to the Diocese to send a person to court with documents concerning the Diocese's net worth. Defendants argue doing so was inconsistent with Illinois Supreme Court Rule 237(a) (eff. Oct. 1, 2021).

¶ 294 Rule 237(a) pertains to service of subpoenas and provides:

> "Any witness shall respond to any lawful subpoena of which he or she has actual knowledge, if payment of the fee and mileage has been tendered. Service of a subpoena by mail may be proved *prima facie* by a return receipt showing delivery to the witness or his or her authorized agent by certified or registered mail at least seven days before the date on which appearance is required and an affidavit showing that the mailing was prepaid and was addressed to the witness, restricted

delivery, with a check or money order for the fee and mileage enclosed." *Id.*

¶ 295     We note defendants did not specially ask for a continuance or any specific relief at trial. To the extent defendants argue the trial court quashed the subpoena, we note "[t]he use of subpoenas is a judicial process, and courts have broad and flexible powers to prevent abuses of their process." *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 62. We review a trial court's decision to quash a subpoena for an abuse of discretion. *Id.*

¶ 296     Here, defense counsel told the trial court, having learned on Friday punitive damages were going to be heard on Monday, it sent a subpoena on Saturday to the Diocese to have a person bring documents to show the Diocese's net worth. That time frame was far less than the seven days contemplated by Rule 237(a) to show proof of service of a subpoena. The court found defendants were on notice of the possibility of punitive damages a year earlier and the subpoena was not timely. We agree with the trial court. As a result, the court did not abuse its discretion regarding rulings pertaining to defendants' subpoena to the Diocese.

¶ 297     We also note defendants argue as evidentiary errors affecting the punitive damage award the trial court erred in finding irrelevant evidence of what the Diocese did or planned to do with money paid to it from Stegall's certificates of deposit or the land from the trust. As previously noted, we find defendant forfeited this issue by failing to cite legal authority. Defendants also contend the court erred by allowing evidence of an offer made to the Rifle Club, which we address further below and find is without merit.

¶ 298                                6. *Jury Instructions*

¶ 299     Finally, defendants argue the trial court erred in declining their proposed jury instruction on punitive damages that all individuals are entitled to present their claims and defenses in a court of law under the first amendment (U.S. Const., amend. I). In their brief, they

state the instruction was based on an Illinois Supreme Court case, but they do not cite the case in their brief. However, defendants cited *DeLuna* with the submitted instruction. That case has nothing to do with the provision of such an instruction in a case involving punitive damages, and defendants provide no explanation as to how it would entitle them to such an instruction. Meanwhile, the court did instruct the jury individuals have the right under the Illinois Constitution to a jury trial in a civil case, and defendants argued to the jury they should not be punished for defending their claims. Given defendants' lack of a cogent argument supported by relevant authority that they were entitled to the instruction and prejudiced by its absence, we find this issue lacks merit.

¶ 300                    F. Trial Court's Bias and Motions to Substitute

¶ 301        Defendants contend they were denied a fair trial because Judge Lane was biased against them, particularly in light of his alleged involvement with the Catholic Church. They also contend the trial court erred in denying their motions for substitution of judge.

¶ 302        Section 2-1001(a)(3) of the Code (735 ILCS 5/2-1001(a)(3) (West 2022)) authorizes each party in a civil case to seek substitution of the trial judge for cause and sets forth the requirements governing such requests. It provides, in relevant part:

        "(ii) Every application for substitution of judge for cause shall be made by petition, setting forth the specific cause for substitution and praying a substitution of judge. The petition shall be verified by the affidavit of the applicant.

        (iii) Upon the filing of a petition for substitution of judge for cause, a hearing to determine whether the cause exists shall be conducted as soon as possible by a judge other than the judge named in the petition. The judge named in the petition need not testify but may submit an affidavit if the judge wishes. If

the petition is allowed, the case shall be assigned to a judge not named in the petition. If the petition is denied, the case shall be assigned back to the judge named in the petition." *Id.* § 2-1001(a)(3)(ii), (iii)

¶ 303        To prevail on a motion to substitute a judge for cause, the defendant must show facts and circumstances indicating the trial judge is prejudiced against him or her. *People ex rel. Baricevic v. Wharton*, 136 Ill. 2d 423, 439 (1990). A trial judge is presumed to be impartial, and the burden is on the party alleging bias to overcome this presumption. *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). The moving party must establish "actual prejudice," either in prejudicial trial conduct or a personal bias, to force removal of a judge for cause under section 2-1001. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 30.

¶ 304        "A judge's rulings alone almost never constitute a valid basis for a claim of judicial bias or partiality." *Eychaner*, 202 Ill. 2d at 280. "Allegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant." *Id.* Moreover, " 'judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.' " *Id.* at 281 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)); see *People v. Urdiales*, 225 Ill. 2d 354, 426 (2007) ("The fact that a judge displays displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the [party] or his counsel."). "A trial court's determination on allegations of actual judicial prejudice in a motion to substitute for cause will not be reversed unless against the manifest weight of the evidence." *In re Marriage of O'Brien*, 393 Ill. App. 3d at 364, 373 (2009).

¶ 305        In addition, a motion for substitution of a judge for cause must be supported by

affidavit of the applicant. 735 ILCS 5/2-1001(a)(3)(ii) (West 2022); see *People v. Jones*, 197 Ill. 2d 346, 355 (2001) ("[A] substitution for cause petition must be supported by an affidavit."). While the statute is to be liberally construed, it should not be interpreted so as to contravene its express affidavit requirement. *People v. Flynn*, 341 Ill. App. 3d 813, 824 (2003).

¶ 306　　　　We note, in each of the first three filings for substitution of Judge Lane, there were no corresponding notarized affidavits from defendants. Instead, they provided unsworn statements or verifications. Thus, for that reason alone, the trial court did not err in denying the motions to substitute. Regardless, since defendants also suggest they were denied a fair trial, we also reject defendants' arguments concerning the court's bias for the reasons below.

¶ 307　　　　　　　　　　1. *Judge Lane's Connection to the Catholic Church*

¶ 308　　　　Here, Judge Lane explained his quote in a news article crediting his Catholic upbringing as making him particularly suitable to be a judge. Judge Lane testified he was not currently a practicing Catholic, had no connection with the Diocese or Sacred Heart Church, and was an atheist. Thus, he had no actual prejudice based on his Catholic upbringing. Based on Judge Lane's testimony, we disagree the record shows religious bias by Judge Lane.

¶ 309　　　　　　　　　　2. *Additional Allegations of Bias*

¶ 310　　　　Defendants also suggest the record shows the trial court's bias depriving them of a fair trial based on a list of allegedly erroneous rulings by Judge Lane or various comments he made they allege show he had a bias against them. However, as previously noted, "[a]llegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant." *Eychaner*, 202 Ill. 2d at 280. Moreover, judicial remarks that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases ordinarily do not support a bias or partiality challenge. *Id.* at 281. Further, defendants'

allegations are also generally stated in a conclusory manner with little to no citation of authority or meaningful related legal argument to demonstrate that error actually occurred. Nor do they set forth most of the alleged errors as separate assignments of error on appeal. Accordingly, we find those matters forfeited. In any event, in our review of the record, we do not agree the record shows a pattern of erroneous rulings or comments evincing bias by Judge Lane against defendants.

¶ 311 Defendants also note times the trial court admonished them and threatened Tonny with contempt, particularly during Tonny's testimony. But the record shows Tonny was providing nonresponsive answers to questions, and we find the comments the court made concerning delays in the case attributable to defendants reasonable. In sum, our review of the record reveals no clear bias on the part of Judge Lane.

¶ 312 Defendants also repeatedly allege they previously hired and fired Judge Lane's former law firm and believe that caused Judge Lane to be biased against them. But defendants made only conclusory allegations of that causing bias and never provided details to support such an assertion.

¶ 313 3. *Denial of Motions for Continuances*

¶ 314 Finally, although set forth as a separate section in defendants' brief, defendants appear to argue only the trial court's denial of motions for continuances showed bias against them, without setting forth the issue as a separate assignment of error or clearly arguing the matter as a separate issue. No legal authority concerning the denial of motions to continue is provided. Accordingly, as previously noted, the issue of whether any given denial of a motion to continue was error is forfeited. Nevertheless, to the extent defendants argue the denial of continuances shows bias, we observe the court did not abuse its discretion in denying

defendants' motions for continuances.

¶ 315    "A trial court must grant a motion for a continuance when the ends of justice clearly so require." *Feder v. Hiera*, 85 Ill. App. 3d 1001, 1002 (1980). "However, it has broad discretion in granting or denying such a motion and, in the absence of a manifest abuse of that discretion, its judgment will not be disturbed on appeal." *Id.*

¶ 316    Here, while defendants complain of various instances where the trial court placed limits on the time for discovery or denied requests for extensions of time, the record contains evidence of multiple instances suggesting an intent on the part of defendants to delay proceedings. While there was also at times evidence to the contrary, the court, which heard and saw the witnesses and could best determine their credibility, reasonably could conclude such was the case. In particular, Penny's motion to continue made the morning of trial was not contemporaneously made with her diagnosis of broken ribs and had little evidentiary support for her claim medication prevented her from attending the trial. Thus, the court did not abuse its discretion in denying the motion.

¶ 317    In sum, we determine defendants' claim of bias on the part of the trial court lacks merit. Defendants failed to support their allegations by affidavit in their multiple motions to substitute Judge Lane for cause, and the court's denials of those motions were not against the manifest weight of the evidence.

¶ 318                              G. Offer to Rifle Club

¶ 319    Defendants next argue the trial court erred in excluding evidence of their offer to transfer land to the Rifle Club. They contend the evidence was admissible to show their mental state regarding fraud and punitive damages and was relevant to fraud and mutual mistake because it shows Stegall could have told defendants as trustees to transfer the land to the Rifle

Club.

¶ 320    As a general rule, offers of compromise or settlement are inadmissible at trial. *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 861 (1998). This principle is codified in Illinois Rule of Evidence 408(a)(1) (eff. Jan. 1, 2011), which provides evidence "furnishing or offering or promising to furnish *** a valuable consideration in compromising or attempting to compromise the claim" is inadmissible if the evidence is offered to prove liability for a claim that was disputed as to its validity or amount. The rule does not require the exclusion if the evidence is offered for such purposes as proving a witness's bias or prejudice, establishing bad faith, or proving an effort to obstruct a criminal investigation or prosecution. Ill. R. Evid. 408(b) (eff. Jan. 1, 2011). In considering the question of admissibility, a court must examine the "totality of the circumstances," including the content of the communication and its timing. *Control Solutions, LLC v. Elecsys*, 2014 IL App (2d) 120251, ¶ 38. "It is within the trial court's sound discretion to determine the admissibility of evidence pursuant to Rule 408, and a reviewing court will not overturn the trial court's decision absent an abuse of that discretion." *Id.*

¶ 321    Here, while defendants argue the offer was not a settlement offer, but instead was evidence of an intent to honor Stegall's wishes, thus showing an innocent mental state pertaining to fraud or mitigation of damages, the record does not clearly show the amount of the offer. Defendants claim they offered the full 35 acres, while plaintiffs claim it was only 5 acres. Nor does the record conclusively show it was offered as anything other than to settle the lawsuit. As such, the trial court did not abuse its discretion by finding the offer was part of the settlement negotiations and barring the evidence.

¶ 322        H. Denial of Motion for a Mistrial Based on Haynes's Testimony

¶ 323      Defendants next contend the trial court erred in denying their motion for a mistrial

based on the jury hearing Haynes's stricken hearsay testimony defendants' sister told him

defendants said "the old man *** was theirs."

¶ 324      A trial court should grant a party's motion for a mistrial when an error occurs of

such gravity it results in a denial of fundamental fairness, such that continuation of the trial

would defeat the ends of justice. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). "Not every

improper comment requires a reversal. Isolated comments that are incidental to a proper

purpose typically do not warrant reversal." *Konewko v. Advocate Health & Hospitals Corp.*,

2020 IL App (2d) 190684, ¶ 83.

¶ 325      Generally, any prejudicial impact of an error may be cured if the trial judge

sustains an objection and instructs the jury to disregard the objectionable testimony. *Id.*; *Clayton

v. County of Cook*, 346 Ill. App. 3d 367, 383 (2003). "However, sustaining the objection might

be insufficient to cure the prejudice in certain instances, such as when the comment was

repeated or made in violation of prior court orders, including orders on motions *in limine*."

*Konewko*, 2020 IL App (2d) 190684, ¶ 83 (citing *Pleasance v. City of Chicago*, 396 Ill. App. 3d

821, 828-29 (2009)). The trial court's denial of a party's motion for a mistrial will not be

disturbed by a reviewing court unless the record demonstrates the trial court abused its

discretion. *People v. Sims*, 167 Ill. 2d 483, 505 (1995).

¶ 326      Here, while Haynes's comment was inflammatory, it was brief and promptly

stricken. The trial court properly instructed the jury to disregard it. Meanwhile, there was ample

evidence of defendants' alleged improper actions at trial. Thus, we do not find the single

comment of Haynes prejudiced the jury so as to require reversal. Defendants rely on *Konewko*

and *Pleasance* to argue otherwise. However, *Konewko* involved many improper comments in

the context of a closely balanced case. *Konewko*, 202 IL App (2d) 190684, ¶ 90. Likewise, *Pleasance* involved repeated improper and prejudicial comments by counsel. See *Pleasance*, 396 Ill. App. 3d at 827-30. Such was not the case here. Accordingly, the court did not abuse its discretion in denying the motion for a mistrial.

¶ 327    I. Probate Proceedings and Admission of the July 6, 2020, Will

¶ 328    Finally, defendants argue the trial court erred in allowing evidence of the July 6, 2020, will at trial without a proof-of-will hearing in the probate case. We held in the first appeal defendants were not entitled to a proof-of-will hearing. *Stegall*, 2024 IL App (4th) 230159-U, ¶ 36. However, defendants now argue the will was nevertheless inadmissible in the declaratory judgment action.

¶ 329    "The general rule on admissibility of prior wills is that only consistent wills are admissible to rebut evidence of undue influence and lack of testamentary capacity." *Zachary v. Mills*, 277 Ill. App. 3d 601, 613 (1996). However, "[a]n exception to this rule exists where the facts support a finding of undue influence and the prior inconsistent wills serve to establish a long-standing disposition scheme subsequently modified under questionable circumstances." *Id.*; see *Kelley v. First State Bank of Princeton*, 81 Ill. App. 3d 402, 417 (1980). We review the trial court's decision to admit evidence of a prior will for an abuse of discretion. *Zachary*, 277 Ill. App. 3d at 613.

¶ 330    Here, the matter involved issues of undue influence, and the July 6, 2020, will was introduced to establish a long-standing disposition that was subsequently modified under questionable circumstances. Thus, the trial court did not abuse its discretion in admitting it.

¶ 331    Defendants also suggest the trial court implied the July 6, 2020, will was valid, thus approving the importance of the document, but we find no such representation in the

record. Defendants also suggest a passing reference to the Diocese and the Rifle Club as beneficiaries of Stegall's will in a jury instruction and that jurors were told not to go by Rifle Club property show the court expressed approval of the document. We disagree. The court did not make any statements approving of the document or suggesting it was Stegall's true will. Isolated, unrelated references to plaintiffs do not show otherwise. Finally, defendants, with only a few conclusory statements and lack of cogent legal analysis, suggest the will was inadmissible because it was not the original and instead was a copy. We find any issue that raises forfeited.

¶ 332                                III. CONCLUSION

¶ 333        For the reasons stated, the trial court's judgment is affirmed.

¶ 334        Affirmed.